STATE *v.* J. J. NEWMAN LUMBER COMPANY.

[60 South. 215]

1. STATUTES. *Construction. Legislative intent. Meaning of words—Master and servant. Regulation of hours of engagement. Manufacturing. Constitutional law. Liberty of contract. Police power. Laws* 1912, *chapter 157.*

   General rules for the construction of statutes should not be used to defeat the purpose of the lawmakers by attributing to them a design to ignore and override the constitutional limitations upon their power to legislate.

2. CONSTRUCTION OF STATUTES. *Use of words. Legislature.*

   On construing the statute the courts must assume that the legislators employed the words of the statute in their usual and most common sense.

3. LAWS 1912, CHAPTER 157. *"Manufacturing". Definition.*

   In construing Laws 1912, chapter 157, prohibiting any person or firm or corporation engaged in manufacturing from working employees more than ten hours a day, etc., the word "manufacturing" should be construed to mean "an organized force of laborers, working with machinery to produce from the raw materials the finished product."

4. CONSTITUTIONAL LAW. *Liberty of contract. Police power.*

   The liberty of contract is subject to regulation within the police power, and it differs from fundamental constitutional rights from the liberty of the body or person, from the right of property and from the right of equality and political liberty, in that it is neither

a vested right, nor a right of definite extent, nor a right protected
by specific constitutional guarantees.

5.   LAWS 1912, CHAPTER 157.   *Applicability.*

Whether this or that person or corporation engaged in manufactur-
ing comes within the purview of chapter 157, Laws 1912, or whether
a particular laborer engaged to work is required to work in man-
ufacturing within the meaning of this law, are questions of fact
for the jury.

The opinion in this case was rendered on suggestion
of error.   For former opinion see 59 So. 923.

*Frank Johnston,* assistant attorney-general, for state.

*S. E. Travis, T. Brady, Jones & Tyler, Green & Green*
and *Whitfield, McNeial & Whitfield,* attorneys for appel-
lees.

Counsel on both sides filed elaborate briefs but too
lengthy for publication.

COOK, J., delivered the opinion of the court.

At a former day of this term this case was affirmed;
the court being of opinion that chapter 157 of the Laws of
1912, entitled "An act to prohibit persons, firms or cor-
porations engaged in manufacturing or repairing, from
working their employees more than ten hours per day,
except in cases of emergency or where the public necessity
requires, and fixing the penalty for such violation,"
is not invalid, so far as the same may apply to appellant's
appeal.   The question is again before us upon the sug-
gestion that the court erred in its former opinion, and it is
earnestly contended that the statute under review is
unconstitutional and void.

The original briefs in the case were complete, both
in citation of authorities and in dextrous and adroit
argument of the principles of law then and now insisted
upon as determinative of the case in favor of appellant's
view of the law.   It follows, necessarily, that the oral
argument was, in a large measure, but a repetition of

what had already been forcibly presented to the court. Many illustrations of the far-reaching effects of the law and the calamitous consequences which will inevitably follow its enforcement have been suggested; but the law, we think, was not intended to reach the numerous forms of manufactures which may be included in the literal definition of the language employed by the legislature.

We are not unmindful of the rules laid down for the guidance of courts in the construction of statutes; but we do not believe the general rules for the construction of the statutes, invoked by counsel, should be used to defeat the purpose of the lawmakers by attributing to them a design to ignore and override the constitutional limitations upon their power to legislate.

The English language is elastic, and new meanings are frequently given to words not authorized by the literal definition of the words from which they are compounded. Indeed, the common understanding of the signification of words in general use will not bear the test of the scholar's scientific analysis. In *Kennington* v. *Hemingway*, 57 So. 809, this court said: "Legislators must be presumed to be reasonable and sane men, 'and to intend the natural, direct, and probable consequences of their acts, that these shall not be absurdly or unreasonably construed, and therefore that they intend to avoid absurdities and nonsense.' . . . Human language is not a perfect vehicle for conveying thoughts, and it frequently happens that words used have a broader or narrower meaning than that intended by the person using them. One of the maxims of the common law, therefore, is '*verba intentioni debent inservire*.' (Words are to be governed by the intention.) As was said by this court in *Board of Education* v. *Railroad Co.*, (72 Miss. 236, 16 South. 489): 'It is familiar learning that, in the construction of statutes, courts chiefly desire to reach and know the real intention of the framers of the law, and, reaching and knowing it, then to adopt that interpretation which will meet the real meaning of the

legislature, though such interpretation may be beyond or within, wider or narrower than, the mere letter of the enactment.' "

The constant changes in and additions to the definition of words is aptly illustrated by the word "manufacture." Dictionaries of latest publication have added new definitions, created by the growth of the language. Referring to Webster's New International Dictionary, 1910, "manufacture" is thus defined: "To produce by labor, esp., now, according to an organized plan and and with division of labor, *and usually with the use of machinery.*" We must conclude that the legislature employed the words of this statute in their usual and most common sense, and when we now speak of manufacturing we *usually* have in mind an organized force of laborers, working with machinery, to produce from the raw materials the finished product. The broader language of our former opinion is qualified to harmonize with this definition.

It would be absurd, we think, to construe this statute to apply to the work of laborers engaged in felling timber in the open air in the equable climate of this state, because he is employed by an employer engaged in manufacturing. It would be fully as reasonable to suggest that the plowman, working in company with a band of agricultural laborers, was covered by the terms of the law; for be it said, if the statute is literally construed, it must be applied to the employers of an organized force of farm hands, and we believe the most radical Progressive would hestitate to give the law an application quite so broad.

Nevertheless we have authority, and learned authority, for a definition of "manufacture" which includes agriculture within its meaning. Mr. Brande in his Encyclopaedia, title "Manufacture," says: "The term is generally applied only to those departments of industry in which the raw material is fashioned into desirable articles by art or labor without the aid of the soil, but

that there is no real good reason for such limitation, and that it is obvious from the slightest consideration that agriculture is nothing but a manufacture, for the business of the agriculturist is to dispose of the soil, seed, manure, or other materials, that they may supply him with other and more desirable products.''

To ''stick to the bark'' often destroys the purpose of the law; but when we take into consideration the history of the law, the birth and growth of the theories embodied in the statute, and then think in the language of the masses, we have a better understanding ·of the evils the representatives of the common morality were endeavoring to regulate. Thinkers, working to con-serve the mental and physical health of toilers in the modern manufactories, have discovered, or think they have discovered, that the concentration of the human mind and muscle, for many consective hours, upon the watching and manipulation of rapidly moving machinery, tends to weary the body of the worker, and to weaken his reasoning faculties, and ultimately, to permanently impair his physical and mental efficiency.

When the legislature prohibited employers engaged in manufacturing from employing laborers for more than ten hours, we think, it was the intention to promote the general welfare and protect the workers in that class of manufacture using machinery of a character which requires in its operation constant tension of mind and body. In other words, it was believed that there are manufactories in this state whose operatives could not work longer than ten consecutive hours without impairing their health, and without endangering their lives and their bodies, and yet competition forced the laborer to take the risk or starve. Believing this, the legislature, in the exercise of the police power of the state, enacted the law under review.

We pause here to remark the notable fact that it is rare for the seller of labor to appeal to the courts for the preservation of his inalienable rights to labor. This

inestimable privilege is generally the object of the buyer's disinterested solicitude. Some day, perhaps, the inalienable right to rest will be the subject of litigation; but as yet this phase of individual liberty has not sought shelter under the state or Federal Constitutions.

We think there is some confusion in the minds of the bar and bench upon the so-called inalienable constitutional right to make contracts—to sell and to buy labor— and the lack of legislative authority to limit this right in the interest of the public welfare. The liberty to contract is not a fundamental constitutional right. The distinction is clearly stated thus: "But the liberty of contract, like all other civil liberty, is subject to restraint and regulation on behalf of the public welfare, and to speak of a constitutional liberty of contract without careful qualification is a vague and meaningless phrase. The liberty of contract yields readily to any of the acknowledged purposes of the police power, and it differs from fundamental constitutional rights, from the liberty of the body or person, from the right of property (including the obligation of existing contracts), from the right of equality, and from political liberty, in that it is neither a vested right, nor a right of definite extent, nor a right protected by specific constitutional guaranties." Freund, Police Power, section 499, p. 537.

Whether this or that person, or corporation, engaged in manufacturing comes within the purview of the statute, or whether a particular laborer engaged to work is required to work in manufacturing within the meaning of the law, are questions of fact. The limitations imposed upon the employment of labor were, of course, intended to be reasonable in their application, and to interpret the words used for the accomplishment of this purpose in their broadest and most comprehensive sense would, to our way of thinking, destroy the law, as well as the intention of its makers.

Appellee was indicted for a violation of the statute and demurrer to the indictment, which demurrer was

sustained. The demurrer should have been overruled. Therefore the suggestion of error is overruled, and the cause is reversed and remanded.

*Reversed and remanded.*
*Suggestion of error overruled.*