SUPERIOR OIL CO. *v.* FOOTE, et al.

May 26, 1952

No. 38416 (59 So. (2d) 85)

858

Wells, Thomas, Wells & Smith, for appellant.

Buchanan & Montgomery, for appellees.

862

**Ethridge, J.**

This case is concerned with the constitutional basis of a statute authorizing the State Oil and Gas Board to require all of the owners in an oil or gas drilling unit to pool and integrate their interests in the unit in order to prevent waste or the drilling of unnecessary wells, and the legality of an order of the Board under that act. We affirm the validity of both the statute and the order.

In 1948 the Mississippi Legislature enacted the Oil and Gas Conservation Act of that year. Miss. Laws 1948,

Chap. 256. Sec. 10(a) authorized the Board under stated circumstances to require all persons owning interests in a drilling unit of 40 acres in area or less to integrate their interests and to develop their lands as a drilling unit. In 1950 Sec. 10(a) of the 1948 Act was amended so as to remove the stated acreage limitation. Miss. Laws 1950, Ch. 220, Sec 3. This type of legislation is usually defined as a compulsory pooling statute, under which owners of small or irregularly shaped tracts can be required by the Board to develop their lands as a single drilling unit for conservation purposes. It is contrasted with a compulsory unitization statute, which applies ordinarily to joint operation on a large scale, such as those covering an entire oil or gas pool. Leslie Moses, Some Legal and Economic Aspects of Unit Operation of Oil Fields, 21 Tex. L. Rev. 961 (1943). The Board's order is based upon Sec. 10(a) as amended in 1950. It provides:

"When two or more separately owned tracts of land are embraced within established drilling unit, the person owning the drilling rights therein and the rights to share in the production therefrom may validly agree to integrate their interests and to develop their lands as a drilling unit. Where, however, such persons have not agreed to integrate their interests, the board may, for the prevention of waste or to avoid the drilling of unnecessary wells require such persons to integrate their interests and to develop their lands as a drilling unit. All orders requiring such pooling shall be made after notice and hearing, and shall be upon terms and conditions that are just and reasonable, and will afford to the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense.

"The portion of the production allocated to the owner of each tract included in a drilling unit formed by a pooling order shall, when produced, be considered as if it had been produced from such tract

by a well drilled thereon. In the event such pooling is required, the cost of development and operation of the pooled unit chargeable by the operator to the other interested owner or owners shall be limited to the actual expenditures required for such purpose, not in excess of what are reasonable, including a reasonable charge for supervision; provided, however, when production of oil or gas is not secured in paying quantities as a result of such forced unitization, the operator shall have no charge against the non-consenting owner or owners. In the event of any dispute relative to such costs, the board shall determine the proper costs, after due notice to all interested parties and hearing thereon. Appeals may be taken from such determination as from any other order of the board.''

## I.

The Gwinville Field is a large pool of gas under a considerable area of land in Jefferson Davis and Simpson Counties, Mississippi. On August 30, 1945, by Order No. 4-45, the State Oil and Gas Board, hereinafter usually referred to as Board, promulgated general rules governing the drilling and development of oil and gas wells. On August 11, 1947, in Order No. 1-47, the Board adopted additional rules for the Gwinville Field. On September 11, 1947, the Board adopted completely new rules for the drilling and operation of oil and gas wells throughout the State. However, these general state-wide rules expressly provided that they did not revoke any Special Field Rules, such as order No. 1-47 of August 11, 1947, and that in the event of a conflict, the Special Field Rules should control. These rules all provided that each gas well in the state must be located on a tract of not less than 320 contiguous surface acres.

The foregoing rules were promulgated by the Board under the authority of Miss. Laws 1932, Chap. 117, and Laws of 1936, Chap. 305, being Code of 1942, Secs. 6132-

6179. Those statutes were repealed on May 9, 1948 by Chap. 256, Laws of 1948, but the latter act in Section 21 expressly provided that the prior orders and rules of the Board were to remain in effect until October 29, 1948. On that day the Board adopted Order No. 18-48, which was applicable to all wells throughout the State and which repealed the order of September 11, 1947. On the same day the Board adopted Order No. 19-48 which repealed Order No. 1-47 of August 11, 1947. As to the questions here involved, the 1948 rules of the Board are identical to the old rules. All of them provide that each gas well must be located on a tract of not less than 320 contiguous surface acres.

On August 4, 1948 Superior Oil Company, and other lessees, holding oil and gas leases on all of the interests under all of the lands involved, entered into an agreement pooling their interests as lessees and providing for the development and operation of a 320-acre unit designated as Unit No. 33. On May 18, 1948, appellant, who was the sole owner of the leases covering all of the interests in the lands in proposed Unit No. 32, executed an instrument which was recorded in Jefferson Davis County named "Designation of Gas and Gas Distillate Unit, Gwinville Field", being Unit No. 32.

On April 23 and May 13, 1948, appellant filed with the Board applications to drill gas wells on Units 32 and 33. These applications reflected the respective names of the proposed units. On April 28 and May 22, 1948, the Board issued permits to drill wells on these units to the Superior Oil Company. These permits as issued to Superior described the locations of the wells. The permit for the well on Unit 33 reflected that it would be on Unit 33, but the permit for the well on what is designated as Unit 32 did not reflect on its face the identity of that unit. On July 16 and on August 4, 1948, appellant, in compliance with Order No. 1-47, filed with the Board plats of Units Nos. 32 and 33 respectively.

The wells on Units 32 and 33 were commenced on May 3 and June 3, 1948, and apparently were completed as gas wells on August 1, and September 8, 1948, respectively. However, the Secretary of the Board testified that the well on Unit 32 was completed on June 29, but this difference in dates is not important. On September 20 and October 20, 1948, the Board executed orders authorizing the wells on these units to produce stated amounts of gas during the months of October and November, 1948. The allowables established were that proportion of the total demand for gas from the Gwinville Field which the number of acres in each of the units, 320 acres, bore to the total number of acres in the Gwinville Field. Thereafter and up to the time of this present suit and proceeding before the State Oil and Gas Board, which was begun on May 1, 1950, and which terminated with the Board's order of September 20, 1950, the Board established gas production allowables for each of these wells on these units to produce in the stated proportions. These allowables, authorized by orders of the Board for each of these months, identified the particular wells, and contained a column "acreage assigned to well * * * 320 acres". The allowable orders of the Board for January, February and March, 1950 expressly stated that "the aforesaid allowables are based upon plats which have been submitted to and approved by the Mississippi State Oil and Gas Board." These allowable orders identified each unit number. On July 16 and March 23, 1948, appellant filed with the Board certificates that the leasehold interests in each unit had been committed to participate in the production from Units 32 and 33.

The gas wells on Units Nos. 32 and 33 have been producing gas since their completion on August 1 and September 8, 1948. The parties, lessees, to the joint operating agreement invested a considerable sum of money in the drilling of the well on Unit 33; and appellant, who held all of the leases on Unit 32 alone, made a similar investment in the well on Unit 32. These lessees and

their lessors, in all more than 100 parties, have continuously from 1948 to date shared in the production from the unit wells on the basis that Units 32 and 33 had been established. At the time appellant filed its petition with the Board on May 1, 1950, asking the Board to integrate the interests of all of the parties in the gas underlying Units 32 and 33, the wells had been producing gas for nearly two years, and the gas produced from these units had been allocated and distributed each month to the separate tracts and owners comprising each unit in the proportion that the number of surface acres in each tract bears to the total number of surface acres in each unit. All of the lessors and mineral owners have been receiving their respective shares in such production, except the five appellees, who have refused to accept the monies which were tendered them by appellant, for reasons later stated.

In 1939 and 1940, the Superior Oil Company, appellant, had obtained oil and gas leases on a sizeable amount of acreage in that Field, including the land in question. The primary terms of most of these leases were for 10 years. The leases covering the mineral interests of appellees had primary terms ending on November 7, 1949 as to two leases; on May 8, 1950 on another lease; and on May 18, 1950, on the other lease covering the mineral interests of appellees. These leases did not permit lessees to pool all of the interests in 320-acre units, so in the latter part of 1948, Superior Oil Company, appellant, obtained pooling amendments to its leases on the tracts in Units 32 and 33 from most of the lessors and mineral owners therein. At the same time, appellant submitted to appellees Foote, Hughes, and Toler a proposed standard form of pooling agreement. By a letter of February 8, 1949, these appellees advised Superior that they would be willing to execute a pooling agreement on several conditions, including limiting the same to cover the particular unit, limiting it to a stated producing horizon for gas, requiring that the production of gas will not extend the leases

beyond the primary term as to any minerals except gas, payment by appellant to appellees of a "fair monetary consideration for the execution of these amendments", and compensation to appellees for the gas allegedly drained from their lands by wells on other tracts owned by appellant. On February 15, 1949, appellant replied to appellees, advising that it had no objections to the stated terms except appellee's requirements that production of gas would extend the lease beyond the primary term only as to the particular horizon under production, the monetary consideration for executing a pooling amendment, and damages claimed for asserted drainage. Appellant advised that if appellees would waive those requirements they would agree to the other amendments to the pooling agreement. Appellees, at the hearing through their attorney, stated that they were willing to pool or integrate their interests "on our terms", and that appellees' terms have not been acceptable to appellant. On September 21, 1949, appellees replied to appellant with reference to the proposed pooling amendments, advising that they thought a consideration of $500 per acre for their interests would be reasonable for executing the pooling amendments. This offer was never accepted.

On May 1, 1950, appellant filed the present petition before the State Oil and Gas Board, averring that Units No. 32 and 33 had been designated and approved by the Board; that Superior owned a lease on all of appellees' interests in the lands, which lease contained no pooling provision; that the primary term of the lease would expire on May 8, 1950, unless the Board integrated their interests with others in the units as authorized by Chap. 220, Sec. 10(a), Laws of 1950, which became effective on April 18, 1950. The petition charged that the defendants who were the predecessors in title of appellee B. C. Griffith and owners of an undivided mineral interest in approximately five acres located in two 20-acre tracts in Unit 32, and the owners of undivided mineral interests in a 20-acre tract in Unit 33, had refused to pool their

interests with the remainder of the lands in the units; that the Board had the power, for the prevention of waste or to avoid the drilling of unnecessary wells, to require such integration; and that the failure to do so would require the drilling of unnecessary wells and would cause waste. The petition was amended on June 5, 1950. It added as defendants appellees Foote, Toler, Gordon, and Hughes. On May 2 Superior petitioned the Board for an emergency order integrating Units 32 and 33, leases upon which would expire on May 8, unless that were done. On May 6 the Board denied this petition.

On July 11, 1950, appellee B. C. Griffith purchased from the original defendants, Gertrude Griffith et al., their mineral interests, and on July 19 he filed his answer to the petition of appellant. B. C. Griffith pleaded that there was no well on his lands and there was no lease thereon; that gas drilling Units No. 32 and 33 had never been established by the Board, "but respondent admits that this Board now has power and authority to establish said drilling units". Griffith admitted that each of the wells on the units was capable of draining and would efficiently drain all of the gas underlying the units. He averred that he was the sole owner of the unleased operating rights to his stated mineral interests. He admitted that integration was the only method which would prevent waste and would protect the correlative right of all of the owners. He admitted the statute was valid. He joined in the prayer of the petition that the proposed units be duly established as gas drilling units "provided the interests of this respondent in said units be integrated as a full, unleased, operating interest."

Appellees Foote, Hughes, Toler, and Gordon filed a separate answer to the petition. They admitted that Superior had filed with the Board plats of proposed Units 32 and 33, but denied that they were approved as drilling units and denied that the tracts were legally established as drilling units. Appellees averred that no hearing for the establishment of such tracts for drilling units was

had as required by Sec. 9(b) of Chap. 256, Laws of 1948, and denied that there was any order of the Board approving such tracts as drilling units. Appellees admitted that gas allowables had been made, but denied that they were valid. They admitted that Superior was operating the two wells, but denied that Superior owned a leasehold estate on all of the lands in both units. In 320-acre Unit 32 appellees claimed to own an undivided one-half interest in the oil, gas and other minerals in 100 acres. In 320-acre Unit No. 33, appellees claimed to own an undivided one-half interest in the oil, gas and other minerals in 20 acres. Appellees charged that they had never been asked to integrate their "real interests" in the gas in such land. They denied that the integration of all interests within the two units was required under the statute, and charged that Superior was a cotenant of appellees and must recognize them as cotenants. They averred that there was then pending in the Chancery Court of Jefferson Davis County a suit by appellees to cancel Superior's leases as clouds on their titles. Appellees asked the court to dismiss Superior's petition in so far as it seeks compulsory integration of interests, or to abate the petition until the proposed gas drilling units had been legally established by the Board, and until appellees had an opportunity to negotiate with Superior a voluntary integration of their unleased interests.

Only four witnesses testified at the hearing before the Board on July 19, 1950. All of them were introduced by appellant Superior Oil Company. H. M. Morse, Secretary and Supervisor of the Board, testified that he was custodian of the records of the Board; that the plats of the two units constituted official parts of the records of his office; and that gas allowables had been assigned to the units in accordance with the acreage certified and designated in the plats. The witness also identified various other papers in the Board's files with reference to Units 32 and 33. He testified that on October 22, 1948, the Board had executed an order approving the joint op-

erating agreements referred to above and executed by appellant and other lessees with reference to Unit No. 33. A joint operating agreement as to Unit No. 32 was not necessary, since Superior owned all of the leases covering the lands in that unit.

Carl F. Grubb was the district geologist for Mississippi for Superior. He testified that Units No. 32 and 33 in the Gwinville Field are "completely underlain with gas", and that the wells located on those units will adequately drain the gas from under the land assigned to the units, subject to drainage and counter-drainage from other wells, but that there would not be any drainage to other wells that was not compensated by counter-drainage.

Gordon McGee was an employee of the Land Department of Superior. He testified that his job had been to secure pooling agreements from all of the land owners, mineral owners, and royalty owners to the leases included in Units 32 and 33; that he had been to see all of such owners in regard to obtaining pooling agreements, and that all of the mineral and royalty owners in the two units had executed pooling agreements except appellees; that appellees had refused to sign pooling agreements similar to those executed by the other owners; that two other mineral owners in the units had declined to sign the offered pooling amendments, but that they had executed such an agreement with some special unidentified provisions in them; that when he asked appellees to sign a standard pooling agreement, their interests were subject to Superior leases which were then in their primary terms.

H. M. Morse, recalled, further testified that there was no application or order in the files of the Board expressly approving the establishment of Units No. 32 and 33, prior to the present proceeding; that Superior had certified to the Board that all of the operating interests had been committed to participate in and to the gas production from the unit wells; that the applications for permits

filed by Superior were the ones then in use when the permits were issued; that the applications were proper and hence the Board issued the permits and later the allowable orders.

Murray Christian, an attorney for appellant, testified with reference to certain correspondence between him and appellees Foote et al. with reference to appellees executing pooling amendments to the leases on the lands in which they held mineral interests. He said that the counter-proposals made by appellees to Superior for pooling were entirely different from the pooling provisions Superior had offered them; and that all of the operating interests in the two units were consolidated for the development of the two units. A colloquy between the attorneys for appellant and appellees makes it manifest that the parties were unable to agree voluntarily upon integrating their interests.

The Board on August 17, 1950, rendered its oral findings of fact. It was unanimously of the opinion that Units 32 and 33 were regular drilling units and complied with all of the requirements of the Board, and that the wells on each unit were located according to the rules of the Board; that the units should be recognized as validly established units and that the mineral interests underlying the lands therein should be pooled, whatever those interests are; and that the Board did not make any findings with respect to title, which should be left to a court of competent jurisdiction. For those reasons the Board on September 20, 1950 executed an order integrating all interests in Units 32 and 33. The Board found that the two units had theretofore been duly and legally established as drilling units; that such unit operations were necessary "to prevent waste and to prevent the drilling of unnecessary wells"; and that appellees and appellant have not agreed to integrate their interests. It ordered that all of the interests in each unit be duly integrated and directed the owners to develop their lands therein as single drilling units; that

the ordered integrations were to be as if "all owners of interests embraced within said units had voluntarily acquiesced in and consented to the integration * * *"; and that production from each tract in each unit shall be considered as if it had been produced from the remainder of the unit. The order directed appellant to deliver to the owners their proportionate shares of the production. It then provided that "the board does not adjudicate matters of title between the parties. * * *"

From that order of September 20, 1950, appellees here appealed to the Circuit Court of Jefferson Davis County. The circuit court on January 30, 1951, reversed the order of the Board and remanded the case to the Board. It found that the two units were not, prior to the present action, duly and legally established as gas drilling units, and that the finding of the Board to that effect was not supported by substantial evidence; that there was no hearing after notice as required by Section 9(b), Chap. 256, Laws of 1948, for the establishment of the two units, and for that reason the two units were not legally established prior to the present hearing; and that therefore the Board was without jurisdiction to enter an order requiring that all separately owned interests in the gas under the lands in each of the tracts be integrated and jointly operated.

## II.

The judgment of the circuit court was not placed upon any constitutional reasons, but appellees assigned as error there and argue here that the due process and impairment of contracts clauses of the state and federal constitutions are violated by Sec. 10(a) and the order under it. The statute is of far reaching and vital significance in the administration of the oil and gas conservation statutes of the state. And the Board's order is based upon Sec. 10(a). So we think that this appeal warrants and requires a decision concerning the consti-

tutional validity of Sec. 10(a). 11 Am. Jur., Constitutional Law, Secs. 111-114.

At least eleven states other than Mississippi have adopted a compulsory oil and gas pooling statute similar in many respects to Sec. 10(a). Those states are New Mexico, Arkansas, Louisiana, Oklahoma, Michigan, Florida, North Carolina, Indiana, Tennessee, Colorado, and Wyoming. See 1 Summers, Oil and Gas (1938), Sec. 83, 84, 104, and 1951 Supp. Sec. 83-83.12, 84, 85, 104; 21 Tex.L. Rev. 754; Moses, Some Legal and Economic Aspects of Unit Operations of Oil Fields, 21 Tex.L.Rev. 961 (1943); Hardwicke, Oil Conservation, 13 Miss. L. J. 381, 401-405 (1941); Myers, Spacing, Pooling, and Fieldwide Unitization, 18 Miss.L.J. 267 (1947); Conservation of Oil and Gas, A Legal History, 1948, edited by Blakely M. Murphy, Section of Mineral Law, A.B.A.; Hardwicke, Unitization Statutes: Voluntary Action or Compulsion, 24 Rocky Mt. L. Rev. 1, 2-5 (1951); Hardwicke, Anti-Trust Laws et al. v. Unit Operation of Oil or Gas Pools (1948); 58 C.J.S., Mines and Minerals, § 230, pages 628-629; 24 Am.Jur., Gas and Oil, §§ 146, 148; see Oil and Gas Production, An Introductory Guide to Production Techniques and Conservation Methods, by Engineering Committee of Interstate Oil Compact Commission (1951), pp. 64-67. Williams, Conservation of Oil and Gas, 65 Harv.L. Rev. 1155, 1168-1177 (May 1952).

All of the courts which have passed upon such compulsory pooling statutes have held them to be valid. ██ ██ The police power of the state includes not only regulations to promote public health, good morals, and good order, but also the right to regulate and to promote development of industry and utilization of natural resources in order to add to the wealth and prosperity of the state. Albritton v. City of Winona, 1938, 181 Miss. 75, 178 So. 799, 115 A.L.R. 1436, appeal dismissed in Albritton v. City of Winona, 1938, 303 U. S. 627, 58 S. Ct. 766, 82 L.Ed. 1088; Ohio Oil Company v. Indiana, 1900, 177 U. S. 190, 20 S.Ct. 576, 44 L. Ed. 729. Hence the

courts have consistently held that the state may enact regulatory laws for and prescribe methods of extracting oil and gas for the purposes of conservation, the efficient utilization of reservoir energy, and the protection of the correlative rights of all owners in a common source of supply. But the statute must not be arbitrary or unreasonable, and the regulation must have a direct, substantial, and reasonable relation to the statutory purpose. Miss. Const. of 1890, Sec. 16, provides that "laws impairing the obligation of contracts, shall not be passed." The U. S. Constitution, Art. I, Sec. 10, cl. 1, has a somewhat similar provision. However, it is well established that this provision is qualified by a proper exercise of the police power of the state. Albritton v. City of Winona, supra; State v. J. J. Newman Lumber Company, 1912, 102 Miss. 802, 59 So. 923, 45 L. R. A., N. S., 851, suggestion of error overruled, 103 Miss. 263, 60 So. 215, 45 L. R. A., N. S., 858. The state must consider the relation of the various rights of citizens and must accommodate their coexistence, and in the interest of the entire community may limit one right so that others may be enjoyed. Hence it is said that all contracts and property rights are subject to a reasonable exercise of the police power. The decisions from other states which have passed on compulsory pooling statutes have consistently applied these principles in holding that such a statute is within the police power of the state, in order to prevent waste, to conserve natural resources, and to protect correlative rights of the owners in a common source of supply.

In California Company v. State Oil & Gas Board, 1946, 200 Miss. 824, 27 So.(2d) 542, 28 So.(2d) 120; Id., 200 Miss. 849, 27 So.(2d) 548, 28 So.(2d) 121, this Court upheld the validity of the oil well spacing rules of the Board for the Cranfield Field in Adams County, and the Board's power to grant exceptions to those rules. See also State Oil & Gas Board v. Superior Oil Company, 1947, 202 Miss. 139, 30 So.(2d) 589, 32 So.(2d) 200.

The leading case upholding a compulsory pooling statute is Patterson v. Stanolind Oil and Gas Company, 1938, 182 Okl. 155, 77 P.(2d)83, appeal dismissed, 1938, 305 U. S. 376, 59 S.Ct. 259, 83 L.Ed. 231. See also Palmer Oil Corporation v. Phillips Petroleum Co., 1951, 204 Okl. 543, 231 P.(2d) 997, appeal dismissed 72 S.Ct. 842; Cities Service Gas Co. v. Peerless Oil & Gas Co., 1950, 340 U. S. 179, 71 S.Ct. 215, 95 L.Ed. 190; Phillips Petroleum Co. v. State of Oklahoma, 1950, 340 U. S. 190, 71 S.Ct. 221, 95 L.Ed. 204.

The Arkansas Court has by implication upheld the Arkansas statute. Yelvington v. Alston, 207 Ark. 266, 180 S.W.(2d) 120. In Dobson v. Arkansas Oil & Gas Commission, 1951, 218 Ark. 160, 235 S.W.(2d) 33, it was held that the Arkansas act did not authorize the commission to unitize an entire oil and gas field.

Sec. 10(a) appears in many respects to be a paraphrase of Act No. 157 of the Louisiana Laws of 1940, LSA-R.S. 30:2 et seq. That statute was first upheld in the leading case of Hunter Company, Inc., v. McHugh, 1942, 202 La. 97, 11 So.(2d) 495, appeal dismissed, 1943, 320 U. S. 222, 64 S. Ct. 19, 88 L.Ed. 5. Other cases upholding the Louisiana act are: Placid Oil Company v. North Central Texas Oil Co., 1944, 206 La. 693, 19 So. (2d) 616; Hood v. Southern Production Co., 1944, 206 La. 642, 19 So. (2d) 336; Hardy v. Union Producing Co., 1944, 207 La. 137, 20 So.(2d) 734; Alston v. Southern Production Co., 1945, 207 La. 370, 21 So.(2d) 383; Crichton v. Lee, 1946, 209 La. 561, 25 So.(2d) 229; Ohio Oil Co. v. Kennedy, La.App.1946, 28 So.(2d) 504; Sanders v. Flowers, 1950, 218 La. 472, 49 So.(2d) 858; and Everett v. Phillips Petroleum Co., 1950, 218 La. 835, 51 So. (2d) 87.

In Hunter v. Justice's Court, 1950, 36 Cal.(2d) 315, 223 P.(2d) 465, reversing the District Court of Appeals in 219 P.(2d) 510, the California Court upheld a species of compulsory pooling. See also Marrs v. City of Ox-

ford, D.C.Kan.1928, 24 F.(2d) 541, affirmed 8 Cir., 1929, 32 F.(2d) 134, 67 A.L.R. 1336.

██ We think that the principles stated in the foregoing decisions upholding the constitutional validity of statutes substantially similar to Sec. 10 are sound and applicable to the Mississippi act. We do not consider for this purpose the factual details and legal effects of the particular pooling orders involved in those cases.

### III.

The circuit court held that there was no substantial evidence to support the Board's finding that the lands comprising the two units had therefore been duly and legally established as drilling units. Sec. 10(a) provides that "when two or more separately owned tracts of land are embraced within an *established drilling unit*" and the owners have not agreed to integrate interests, the Board may order an integration.

We do not need to decide here whether a general order of the Board promulgating spacing rules and fixing the maximum efficient drainage area of all wells in an oil or gas pool or common source of supply constitutes the establishment of a drilling unit within the condition precedent set out in Sec. 10(a). ██ In the present case, Units 32 and 33 were located and fixed on the ground by lessees then having the exclusive right to drill on those lands, and these actions were approved on numerous occasions by the Board. The facts are outlined in detail above. They consist in appellant obtaining permits to drill on these units, the grant of such permits, the filing of plats, monthly allowable and adjusted allowable orders of the Board for these units for each month for almost two years; orders expressly approving the plats of these units, dated January, February and March, 1950; the joint operating agreements of the lessees and the investment of considerable sums of money in the

wells on these units; and numerous other factors demonstrating approval by the Board of the creation and establishment of these drilling units.

The only answer to that proposition which the appellees seriously argue is that Sec. 9(b) requires a notice and hearing before the Board before the establishment of a drilling unit for each particular unit on the ground; and that no such notice and hearing was held for the establishment of Units 32 and 33. However, the joint operating agreement of August 4, 1948, designating Unit 33, and the designation of Unit 32 of May 18, 1948, were made at a time when appellees' and other owners' mineral interests were under admittedly effective leases owned by the parties to those instruments designating the units. Those lessees owned the exclusive right to drill for and produce gas. And in the drilling and spacing of wells, the lessee represents the royalty owners. 31-A, Texas Jur., Oil and Gas, Sec. 426, p. 746.

Moreover, Sec. 9 deals with the power of the Board to regulate the drilling and location of wells in any pool. Sec. 9(b), upon which appellees rely in their argument that there must be a notice and hearing before a particular drilling unit can be established, refers to the "rights of the owners in a pool" and provides that the Board shall after notice and hearing "establish a drilling unit or units for each pool". Sec. 4(e) and (f) states that "pool" means an entire underground reservoir containing a common accumulation of oil or gas. Hence when Sec. 9(b) states that the Board must have a hearing to establish drilling units "for each pool", it necessarily refers to the establishment of the maximum efficient drainage area of a well, Sec. 4(l), lying within an entire underground reservoir of gas or oil, Sec. 4(e) and (f). Hence Sec. 9(b), upon which appellees rely, has no requirement whatsoever that prior to a lessee with the exclusive right to drill obtaining a permit to drill a particular well in a particular unit, there must be notice and hearing to lessors. It applies to an entirely different

situation. Notice and hearing prior to the promulgation of the general spacing and drainage area order of August 11, 1947, unquestionably was had. The order so adjudicates, and appellees make no claim that such notice and hearing were not had. That was the notice and hearing required by Sec. 9(b) to establish a drilling or drainage unit for the entire Gwinville Field.

Sec. 16 of the 1948 Act provides: ''Any person desiring or proposing to drill any well in search of oil or gas, before commencing the drilling of any such well shall notify the supervisor upon such form as the board may prescribe. The drilling of any well for oil or gas is hereby prohibited until such notice is given and a permit therefor is issued. Provided, however, the drilling of any well, which is not in accordance with a spacing pattern fixed by the board, is hereby prohibited until and unless a permit is issued by the board after notice and hearing.'' This statute requires only that notice be given to the Supervisor of the Board and that a permit be obtained prior to drilling a well. An exception to this requirement exists where the drilling is not in accord with the spacing pattern fixed by the Board. Units 32 and 33 are in accord with the spacing pattern, so the first sentence in Sec. 16 is applicable. The notice required under Sec. 16 is that to the Supervisor of the Board. See Placid Oil Co. v. North Central Texas Oil Co., 1944, 206 La. 693, 19 So.(2d) 616.

## IV.

Sec. 10(a) requires that there must be two or more separately owned tracts of land within an established drilling unit. Appellees contend that this condition does not exist, asserting that they are cotenants with all of the other owners in the entire 320 acre unit. But this position is inconsistent with appellees' claim that they are separate and independent owners of undivided interests in small tracts within the units. Unit 33 contains 16 separate and distinct oil and gas leases owned by

two different companies; and Unit 32 lists 12 separate and distinct leases. The present situation is clearly distinguishable from Meeker v. Denver Producing and Refining Company, 1947, 199 Okl. 155, 188 P.(2d) 854, where Meeker owned a 1/16 interest in each and every acre of an 80-acre unit. Appellees here own only fractional interests in small parts of the units. In both of them, there are involved two or more separately owned tracts.

## V.

Section 10(a) and (c) requires that the parties "have not agreed to integrate their interests * * *" and have failed to agree. Clearly, the Board's finding that the parties have not so agreed is correct. The testimony outlined above, the admissions of appellees' and appellant's attorneys and the fact that this law-suit is before this Court makes it manifest that this finding of the Board is supported by the overwhelming weight of the evidence.

## VI.

The Board was amply warranted in holding that the order requiring integration of the two units will prevent waste and will avoid the drilling of unnecessary wells. Both the 1947 and 1948 rules for the Gwinville Field are premised on the finding by the Board that such rules are necessary to prevent waste. Aside from the question of whether they are subject to collateral attack, appellees make no effort to show that those findings are wrong. Furthermore, the order of September 20, 1950, now under review, expressly finds that integration is necessary to prevent waste and to avoid the drilling of unnecessary wells. The testimony of Carl F. Grubb, geologist, supports that finding and is uncontradicted by any other evidence.

Moreover, the Board has found that one well will efficiently drain 320 acres. If it will do this, a second well on the same 320 acres would be an unnecessary well.

## VII.

 █ It is suggested that compulsory pooling under Sec. 10(a) is available only before and not after a well is drilled; and that, therefore, the Board had no power to execute the instant order where the wells had been drilled and production had begun two years before. It is said that Sec. 10(a), when it refers to the right of the parties to agree to integrate and *develop* their land, means to discover or to detect minerals, referring to the future.

The statute says that the Board may ''* * * require such persons to integrate their interests and to develop their lands as a drilling unit.'' It does not say that the Board may do this only before and not after a well is drilled. If such an intent had existed, presumably it would have been incorporated in the statute. Further this interpretation might prohibit many needed actions of the Board. Oftentimes the Board, as here, may find it necessary to integrate interests in order to prevent the drilling of unnecessary wells.

In the following cases from other states, the orders of the administrative agency integrating the drilling units were adopted several months *after* the wells were completed: Hunter Co., Inc., v. McHugh, 1942, 202 La. 97, 11 So.(2d) 495; Patterson v. Stanolind Oil & Gas Co., 1938, 182 Okl. 155, 77 P.(2d) 83; Alston v. Southern Production Company, 1945, 207 La. 370, 21 So. (2d) 383; Crichton v. Lee, 1946, 209 La. 561, 25 So.(2d) 229.

## VIII.

 Appellees contend that the order is void because it failed to comply with Sec. 7(f) of the 1948 act, which provides as follows: ''Any interested person shall have the right to have the board call a hearing * * *. Upon the receipt of any such request, the board promptly shall call a hearing thereon, and, after such hearing and with all convenient speed, and in any event within thirty (30) days after the conclusion of such hearing, shall take

such action with regard to the subject matter thereof as it may deem appropriate.''

This matter came on for hearing before the Board at the July, 1950 meeting. The hearing was concluded on July 19 and the matter was passed to be considered by the Board in executive session. On July 20 the matter was continued and taken under advisement for decision only at the regular August meeting. At the regular August meeting on August 17, the Board rendered its decision in oral form. On the same date, the Board continued this docket over to the regular September, 1950 meeting for the purpose of entering orders in accordance with the Board's decision. The Board's final order was executed September 20, 1950. Hence appellees say that the hearing was concluded on July 19, and the final order was not entered until about two months thereafter on September 20; that therefore the Board did not comply with the requirement of Sec. 7(f) that it must take action within 30 days after the conclusion of the hearing; and that the order is void.

We cannot agree. The Board had the right to continue the ''hearing'' in order to determine what it would do. It did this on July 20 until August 17. It then rendered its opinion and continued the matter until September until a proper order could be drafted. Moreover, Sec. 7(f) does not provide that action of the Board taken more than 30 days after a hearing is invalid. That was not the legislative intent. The purpose of the statute was to place upon the Board a responsibility to act expeditiously. We do not consider whether appellees could have had any remedy by mandamus; that is not an issue here. Moreover, appellees do not show that they were prejudiced in any respect by the delay in the execution of the order.

## IX.

The final order of the Board provides in part as follows: ''The integrations above ordered, both in

Unit No. 32 and in Unit No. 33, are to be in such manner and to such effect as if all owners of interests embraced within said units had voluntarily acquiesced in and consented to the integration of said tract in the manner and form as created, and in such manner and form that the portion of production allocated to the owner of each tract included in said gas drilling units shall, when produced, be considered as if it had been produced from such separately owned interests by a well drilled on the tract containing said interests * * *''

The last-quoted part of this order, which states that the portion of production allocated to each tract shall be considered as if actually produced from such tract, is a paraphrase of a provision in the second paragraph of Sec. 10(a) and, although surplusage, is not erroneous, since the statute itself so provides. However, the first part of the above quoted provision should not have been included in the order. It is not authorized by the statute, and could be construed as contradictory of the Board's disavowal of any intent to pass upon title questions. However, we consider that it is harmless surplusage, since we interpret and limit its meaning to a statement by the Board that appellees' interests are subject to the integration order, whether their interests are subject or not subject to leases.

For the foregoing reasons we conclude that the circuit court was in error in holding that the order of the State Oil and Gas Board of September 20, 1950, was invalid. Sec. 10(a), giving the Board power to require pooling, is within the police power of the state and is constitutionally valid. The order of the Board is proper and should be reinstated and affirmed. The Board's order integrated the interests of appellees and all other owners, and correctly stated that it did not adjudicate what those interests were, that is, whether the establishment of the drilling units or the order of integration had the effect of extending or reinstating the primary terms

of the leases. Hence we do not consider or decide those questions. We review only the order.

Reversed, and order of State Oil and Gas Board reinstated and affirmed.

**McGehee, C. J.,** and **Roberds, Alexander, Holmes** and **Arrington, JJ.,** concur.

**Hall** and **Kyle, JJ.,** being disqualified, took no part in this decision.

**Lee, J.** (dissenting).

I do not contend that the legislature was without authority to enact Chapter 256, Laws 1948, as amended by Chapter 220, Laws 1950. Thus it is unnecessary to comment on many of the authorities cited in the majority opinion. My position is that the proceedings in this case do not conform to the pattern which was formulated by the above mentioned statutes.

The appellant derived its rights under leases executed on November 7, 1939, and May 8 and 18, 1940, the primary terms of which were ten years. Unless it produced oil or gas in paying quantities from the lease lands within the primary terms, the leases became forfeited. Those contracts contained no pooling or force majeure provisions.

Subsequently the appellees acquired their mineral interests, subject to the outstanding leases. Hence, at the expiration of the primary terms of such leases, if neither oil nor gas had been produced in paying quantities, the appellants' reversionary fees in the minerals in place ripened into fee simple titles thereto. Koenig v. Calcote, 199 Miss. 435, 25 So.(2d) 763.

Appellant established Units 32 and 33 and completed gas wells on August 1 and September 8, 1948, respectively, and such wells have been producing gas in paying quantities ever since.

Though appellees' interests are situated in these units, the wells were not drilled on the lands in which they are interested.

Three salient provisions of Section 10(a), Chapter 220, supra, give the conditions precedent to, and set the pattern for, compulsory integration or pooling. They are as follows:

"(1) When two or more separately owned tracts of land are embraced within an established drilling unit, the person owning the drilling rights therein and the rights to share in the production therefrom may validly agree to integrate their interests and *to develop their lands as a drilling unit.*

"(2) Where, however, such persons have not agreed to integrate their interests, the board may, *for the prevention of waste or to avoid the drilling of unnecessary wells* require such persons to integrate their interests and *to develop their lands as a drilling unit* * * *.

"(3) In the event such pooling is required, the *cost of development* and operation of the pooled unit chargeable by the operator to the other interested owner or owners shall be limited to the actual expenditures required for such purpose not in excess of what are reasonable, including a reasonable charge for supervision; provided, however, when production of oil or gas is not secured in paying quantities as a result of such forced unitization, the operator shall have no charge against the nonconsenting owner or owner. * * *" (Emphasis supplied.)

The whole idea of both voluntary and compulsory integration is to *develop* the lands for oil or gas. Evidently the legislative purpose was to give a remedy where several different owners in a unit did not voluntarily agree *to develop* their lands, and, on that account, wells either were not drilled, or, if drilled, they would be unnecessary.

But, in this case, the lands had already been *developed.* Units 32 and 33 were developed units. Section 4(m)

Chapter 256, supra, defines developed unit as follows: " 'Developed area' or 'developed unit' shall mean a drainage unit having a well completed therein which is capable of producing oil or gas in paying quantities."

In this case the wells were drilled and the lands were *developed* in 1948, even before compulsory integration was authorized. Gas was discovered. Pipes were set. The operation was complete. Meters were installed. The faucets were turned on. All that remained was to read the meters and collect.

No other well could be drilled in either of these Units. The spacing regulations were already in effect and only one well could be located on 320 acres.

Besides, since the wells had been in operation since 1948, the danger of waste could not arise. At that time, in addition to its ordinary meaning, waste included underground and surface waste and that incident to production of gas, crude oil or petroleum. Section 8, Chapter 117, Laws 1932. It also included "the production of natural gas in excess of transportation or market facilities or reasonable market demand." Section 9(a), Chapter 305, Laws 1936.

Thus when the Board ordered compulsory integration against the appellees, none of the conditions precedent thereto existed. The units were already developed. Prevention of waste did not necessitate such an order. It was not required for the purpose of avoiding the drilling of unnecessary wells.

The language of these Acts, relative to compulsory integration is plain and simple. The intention of the legislature should be gleaned from what it says. Simplicity should be commended for its forthrightness. It ought not to have its meaning and purpose sheared away for the reason that, in the maze and mystifying labyrinth of decisions from other jurisdictions, construing statutes partially or totally different, some other conclusion has been reached.

The majority opinion cites one Oklahoma and several Louisiana cases as authority for compulsory integration after the development of the unit.

But in Patterson v. Stanolind Oil & Gas Co., 182 Okl. 155, 77 P. (2d) 83, 86, the Oklahoma case, the sole questions before the court were: "(1) Does the state have the power to enact legislation providing for well-spacing? (2) If it does possess such power, is the same constitutionally exercised by the enactment of (the statute in question)?" The language thereof is as follows: "In the event a producing well, or wells, is completed upon a unit where there are two or more separately owned tracts, any royalty owner, or group of royalty owners, holding the royalty interest under a separately owned tract, shall share in one-eight (⅛) of all of the production from the well or wells drilled within the unit in the proportion that the acreage of their separately owned tract bears to the entire acreage of the unit." The court decided both questions in the affirmative. It should be kept in mind that the Oklahoma law provided for integration, after completion of the well, thus definitely assuring to the royalty owners an interest in the spaced unit, whether the well was drilled on lands in which they had an interest or not. On the contrary, our law contemplates integration *before* drilling. Besides, in this case, ownership of minerals not royalty is involved. Our statutes simply provide for an equitable distribution. It may be that, in a situation such as exists here, the appellees already have their remedy. Wight v. Ingram-Day Lumber Co., 195 Miss. 823, 17 So. (2d) 196; Memphis Stone & Gravel Co. v. Archer, 137 Miss. 558, 102 So. 390. The opinion in the Oklahoma case says that the Commission, under the Constitution itself, is granted legislative, judicial and executive powers, and on that account, "the decisions from other states * * * are neither persuasive nor controlling * * *."

In Hunter Co., Inc., v. McHugh, 202 La. 97, 11 So. (2d) 495, one of the cited Louisiana cases, Hunter Company

had completed the first gas well in the Jeter Zone on a 190 acre tract on June 1, 1938. Order 28b, promulgated by the Director of the Department of Minerals on June 27, 1941, under authority of Act No. 157, Laws 1940, permitted only one well to each 320 acres. The effect of the unitization order there under review was to add 130 acres to the 190 acre tract on which the well had been drilled. In other words, it was deemed unnecessary to drill a well on the 130 acres, and in lieu thereof, the owners should be permitted to share in the production from the existing well—the Director was trying to provide some benefits to the smaller holders without drilling another well. The rationale for the court's conclusion that the police power of the state could be used to force integration in that case seems to me to be best stated by an excerpt from Lilly v. Conservation Commissioner of Louisiana, D. C., 29 F. Supp. 892, 897, used as a documenting authority. That excerpt is as follows: "Especially is this true in Louisiana, where, under the settled law, differently from some other states, the owner of the surface or holder of a mineral lease does not actually own the fugitive minerals of gas and oil, but (has) merely an exclusive right of servitude to go upon and explore for and produce the same. The ownership becomes vested only when the minerals are brought to the surface and reduced to possession."

Our State is committed to the rule of ownership of gas, oil and other minerals in place. Koenig v. Calcote, supra. I am, therefore, unable to comprehend how the stated legal principle of Louisiana can be invoked as an authority here, when it is so utterly different from, and in conflict with, the established jurisprudence of our state.

Even in Crichton v. Lee, 209 La. 561, 25 So. (2d) 229, 232, another Louisiana case cited in the majority opinion, the order of integration was entered before the expiration of the lease, and except for that fact, it was conceded that even in that state, the lease would have lapsed. "We concede that, under the facts in this case, the lease would have lapsed at the end of the primary term in the absence

of Order No. 10-C, which became effective on February 1, 1941, prior to the expiration of the primary term of the lease.''

In the case before us, the primary terms of the leases had expired before the order of compulsory integration. In my opinion, the Louisiana case is authority against the conclusion of the majority opinion.

Compulsory integration and pooling of interests have been specifically authorized by Louisiana law as early as 1936. Act No. 225, Laws of 1936. The vital distinction between the Louisiana cases and the case before us is that there was both constitutional and statutory authority in Louisiana for what its courts approved in those cases, whereas, in the case before us, for the reason already assigned, there was no authority, either constitutional or statutory, for compulsory integration of the appellees' interests.

Since the order of the Board, in my opinion, was beyond its power, and, under California Co. v. State Oil & Gas Board, 200 Miss. 824, 27 So. (2d) 542, 28 So. (2d) 120, this cause should be reversed and dismissed, I respectfully dissent from the conclusion reached by the majority.

ON SUGGESTION OF ERROR

July 17, 1952 (59 So. (2d) 844)

**Alexander, J.**

It is suggested that while the opinion herein repeatedly disclaimed any purpose to adjudicate the title or interest of the parties, the following language may contain an implication that the several interests have been identified and adjudicated: ''All of the lessors and mineral owners have been receiving their respective shares in such production, except the five appellees, who have refused to accept the monies which were tendered them by appellant, for reasons later stated.'' [59 So. (2d) 89.]

In spite of the absence of sufficient basis for such inference, but in deference to the anxieties of counsel, we reiterate that the above language was in no degree a modification of our assertions that neither the title to nor extent of the several interests is involved nor adjudicated.

However, on the merits the suggestion of error is overruled.

Overruled.

All Justices concur.