W. Sale LEWIS, Savings and Loan Commissioner of Texas, and Oak Cliff Savings and Loan Association, Appellants,

v.

HERITAGE SAVINGS ASSOCIATION, Appellee.

No. 12094.

Court of Civil Appeals of Texas, Austin.

Dec. 12, 1973.

John L. Hill, Atty. Gen., Larry F. York, John H. Banks, Asst. Attys. Gen., Austin, Frank E. McLain, Turner, Rodgers, Sailers, Jordan & Calloway, for appellants.

Dudley D. McCalla, Heath, Davis & McCalla, Austin, for appellee.

PHILLIPS, Chief Justice.

This is a suit for judicial review of an order of the Savings and Loan Commissioner, approving the application of Oak Cliff Savings and Loan for permission to operate a branch office in Duncanville, Dallas County, Texas. Appellee, Heritage Savings Association, was a protestant at the administrative hearing. The trial court declared the order of the Commissioner was not supported by substantial evidence and set it aside. We reverse the judgment of the trial court and reinstate the order.

■ The principal question before this Court is whether the trial court was correct in concluding that the order and Commissioner's findings of public need, sufficient volume of business and absence of undue harm were not supported by substantial evidence. These prerequisites for the granting of a charter are found in Section 2.4 of the Rules and Regulations for Savings and Loan Associations, promulgated by the Savings and Loan Section of the Finance Commission of Texas.

The underlying findings of fact and the conclusions of the Commissioner are as follows:

"The Commissioner finds that there is a public need for the proposed branch office and the volume of business in the community in which the proposed branch office will conduct its business is such as to indicate a profitable operation to the association within a reasonable period of time and that the proposed operation will not unduly harm any other association operating in the vicinity of the proposed location.

"Duncanville is located in the southwest quarter of Dallas County. The city of Duncanville has experienced a rapid increase in population. The population of the city increased from 3,785 in 1960 to 11,730 in 1970. The population of Duncanville is expected to exceed 17,000 persons by 1975. Many of the residents commute outside the city to work.

"The service area of the proposed branch office includes Duncanville and its environs, nearby Cedar Hill and its environs, and a portion of the southwest part of the Oak Cliff section of Dallas. The total population of the service area increased from approximately 7,500 in 1960 to approximately 20,000 in 1970. The pop-

ulation of the service area is expected to reach the vicinity of 37,000 in 1975. Duncanville, Cedar Hill, and environs alone had a population of approximately 18,000 in 1970, expected to increase to more than 27,000 in 1975. Average family income in the service area in 1970 was in excess of $10,000.

"Presently located in the service area is one savings and loan association with its home office in Duncanville. Two commercial banks are located in the service area. The growth of the area is reflected in the experience of these institutions. From year-end 1965 to year-end 1970, total deposits of these banks approximately tripled, increasing from $4,777,000 on the former date to $14,935,000 on the latter date. From year-end 1965 to year-end 1970, the bank located in Duncanville enjoyed an increase in total deposits of approximately $5,700,000. Approximately half of the increase in the Duncanville bank represented an increase in time deposits.

"The savings and loan association located in Duncanville maintains two branch offices in other portions of Dallas County. One of these branch offices has not been particularly successful for the association, but it continues in operation. The association opened in 1962 and, by year-end 1970, had total savings of approximately $7,432,000 and total mortgage loans outstanding of approximately $7,500,000. Of this association's total savings at year-end 1970, $3,457,624 represented accounts from residents within the city limits of Duncanville, and an additional $822,700 represented accounts of residents within the southwest quarter of Dallas County but outside the Duncanville city limits. The association had at least one account from 1,579 different households in Duncanville.

"The association located in Duncanville has enjoyed substantial growth. From year-end 1965 to year-end 1970, total savings increased from approximately $3,000,000 to approximately $7,400,000. The association has been meeting its reserve requirements in recent years. Since opening in October, 1962, the association has earned well in excess of $200,000. In mid-1969, the association opened a large, attractive new home office at a cost in excess of $200,000.

"The housing needs of the rapidly growing populace in the service area have created a substantial demand for new residences. In Duncanville and Cedar Hill more than 2,000 new residential units were authorized during the years 1966 through 1970, and almost 1,000 of these units were authorized in 1970 alone. In Duncanville, single-family residential construction has been dominant in recent years although 520 units in multi-family dwellings were authorized in 1970. During the five years preceding the hearing, approximately 1,200 new, single-family residences have been authorized in Duncanville alone. Beginning in 1967, the total value of residential permits authorized in Duncanville has exceeded $3,000,000 every year, and in 1970 the total of such permits was approximately $9,500,000. There has also been a substantial volume of residential construction in the neighboring town of De Soto.

"Approximately 50% of both the single-family and multi-family residential units authorized in Duncanville in 1970 represents housing for lower-income groups, subsidized in one way or another by the Federal Housing Administration. Even these lower-income, single-family residences sell for prices ranging, approximately, from $16,000 to $18,000, and many, more expensive residences have been built and continue to be built in Duncanville.

"The association located in Duncanville concentrates its lending activities in the new, single-family, non-FHA, residential-dwelling market in Duncanville. In 1970, the association made approximately 50% of the loans in this limited category. Other savings and loan associations, mortgage companies, commercial banks, and other lenders also compete in the mortgage-lending market in Duncanville and in the serv-

ice area, but the magnitude of the market penetration of these associations (other than the one located in Duncanville and the applying association) is unknown. However, none of these other competing associations maintains an office within the service area. The need for additional residential mortgage-lending services will increase as the population of the service area continues to grow.

"The large and growing populace of the service area, the high level of family income and the experience of financial institutions in the service area demonstrate the availability of sufficient savings to permit this additional facility to operate profitably without harming any other association. The already abundant residential-mortgage lending opportunities in the service area will be increased by the housing demands of a growing populace. The heavy demand for residential-mortgage lending funds is evident from building permit data. This additional branch will provide a needed competitive alternative to serve the savings and lending needs of the public in a dynamic area, and sufficient savings and loans to support the additional office without unduly harming any existing association are available.

"In addition to attracting new customers to the savings and loan industry, this additional office will enable the applying association to better serve its existing customers in the area. As of February 18, 1971, the applying association had, within Duncanville and the surrounding area designated on the map attached to its application, approximately $2,951,000 in savings and approximately $2,730,000 in mortgage loans outstanding.

"The Commissioner further finds that the Rules and Regulations promulgated by the Savings and Loan Section of the Finance Commission and the statutes, relating to the application for and the approval of branch offices of savings and loan associations in this state, have been fully complied with by the applicant, and that all re-quirements of the rules and statutes have been fully satisfied."

We have reviewed the entire record made before the Commissioner and find that although certain of the findings contained in the order set out above were hotly contested, they are, in the main, supported by substantial evidence.

Appellee, Heritage Savings Association, stresses that Duncanville is a "bedroom" city from which most of the inhabitants commute to Dallas; that there are almost no commercial businesses in Duncanville; that Heritage Savings has made nearly 50% of the loans on new housing; that appellant is a giant savings institution seeking to invade the territory of a much smaller institution to the latter's "undue harm"; that appellants' president admitted that had Oak Cliff been able to purchase appellee (as it attempted to do), no additional branch in Duncanville would have been sought by Oak Cliff.

This Court would be less than candid were it not to state that appellee has made an excellent case for the denial of the charter. Reasonable minds could easily have been swayed in its direction; however, the converse is equally true. One of the tests of substantial evidence stated by the Supreme Court of the United States in Labor Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660 (1939) was that the evidence must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. Assuming the facts just stated, this Court simply could not have directed a verdict in this case. Consequently, since there is substantial evidence supporting the Commissioner's findings on public need, sufficient volume of business and absence of undue harm, the order must stand.

■ One remaining question in the case is the validity of the order in view of the Commissioner's violating his rules and reg-

ulations by not ruling on the branch application for more than thirty days after the close of the administrative hearing.

The hearing on Oak Cliff's application was held on March 9 and 10 of 1971. The order approving the application was entered on September 13, 1971. Rule 1.9 of the Rules and Regulations which were in effect at all times pertinent to this application provides that: "The Commissioner shall render his decision within thirty (30) calendar days after the date the hearing is finally closed. . . . "

We hold that the failure of the Commissioner to act within the thirty day period does not invalidate the order under the facts of this case. In the first place, the record does not reveal any effort by either party, either before or after the expiration of thirty days, to obtain a prompt decision. Secondly, appellee cannot show any prejudice, because, as an existing institution, it remained free of competition from appellants so long as the Commissioner failed to rule. To set aside the Commissioner's order here would itself create an additional administrative delay. See Merchants Fast Motor Lines v. Newman, 236 S.W.2d 646 (Tex.Civ.App.1951, writ ref. n. r. e.); Superior Oil Co. v. Foote, 214 Miss. 857, 59 So.2d 85, 37 A.L.R.2d 415 (1952); Brookhaven Housing Coalition v. Kunzig, 341 F.Supp. 1026 (E.D.N.Y.1972).

The judgment of the trial court is reversed, and judgment here rendered reinstating the Commissioner's order.

Reversed and rendered.

SHANNON, Justice.

I respectfully dissent.

The hearing of the application for branch office finally closed on March 10, 1971, and on September 13, 1971, nearly six months later, the Commissioner entered his order approving the application. Section 1.9 of the Rules and Regulations for Savings and Loan Associations provides that "the Commissioner *shall* render his decision within thirty (30) calendar days after the date the hearing is finally closed. . . . " (emphasis supplied).

It is settled that procedural rules are binding upon administrators who issue them. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73 (1939). As the Commissioner violated Section 1.9 by rendering his decision nearly five months late, the question to be resolved concerns the consequences accorded that violation.

The majority has held that the violation of the rule will be excused unless the party complaining can demonstrate that he attempted in some manner to obtain a prompt decision from the Commissioner and unless that party can demonstrate harm flowing from the delay. Were the question an open one, I would agree with the majority. However, Bay City Federal Savings and Loan Ass'n. v. Lewis, 474 S.W.2d 459 (Tex.1971) dictates otherwise.

In that case the petitioners complained that the Commissioner failed to set out the underlying facts supporting his finding that the prerequisites set out in certain Sections of Vernon's Tex.Rev.Civ.Stat. Ann. Art. 852a had been complied with. Such omission, petitioners said, in view of Section 11.11(4) vitiated the entire order. Section 11.11(4), among other things, requires that the Commissioner's findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings.

In reversing the judgment of this Court, the Supreme Court said:

"The Court of Civil Appeals attempts to distinguish this case from its prior decision in Gonzales [Gonzales Cty. Savings & Loan Assn. v. Lewis, 461 S.W.2d 215] on the grounds that the findings of

the Commissioner in the Gonzales case were contested on the merits but 'were never seriously at issue' in this case, and that Petitioners do not contend that they were harmed by the Commissioner's failure to follow the statutory requirement in this case. Likewise, it is pointed out that the complaining parties in Gonzales urged lack of substantial evidence to support the findings which were not accompanied by statements of underlying facts, while Petitioners here did not preserve their substantial evidence challenge to the finding that the prerequisites of Sections 2.02–2.06 had been complied with.

"We cannot agree that these distinctions relieve the Commissioner from complying with the mandatory provision of Section 11.11(4) of Article 852a, which specifically requires that when his findings of fact are in statutory language, they 'shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings.' This part of the Act is not conditioned on whether the findings were contested on the merits, whether lack of substantial evidence was urged, or whether or not Petitioners alleged that they were harmed by the Commissioner's failure to comply with the law.

"This is a case of statutory construction in which the plain meaning and requirement of the statute are obvious. The legislature has delegated to the Commissioner the authority to grant a charter application, and the Commissioner may exercise such delegated authority only in the manner prescribed by the legislature.

\*    \*    \*    \*    \*    \*

"The Court of Civil Appeals said 'we feel that neither appellants nor this Court would benefit by remanding this case to the Commissioner with instructions to set out the underlying facts supporting a finding which in fact is not contested.' This may be true. However, appellants and the court are not the only ones concerned with the Commissioner's order and his failure to follow the procedure required by law. The public has an interest in the administrative decisions of State agencies, especially where they concern the public need for savings and loan agencies. We assume that the public also has a general interest in the laws of the State being followed as they are written."

It makes no difference that the Commissioner in *Bay City* violated a statute and in this case an agency rule since a rule or order promulgated by an administrative agency acting within its delegated authority has the same force and effect as if it were the act of the legislature. Texarkana & Ft. S. Ry. Co. v. Houston Gas & Fuel Co., 121 Tex. 594, 51 S.W.2d 284 (1932).

It occurs to me that the meaning and requirements of the rule in this case are quite as obvious as those of the statute in *Bay City,* and that the reasoning in that case compels the conclusion that the Commissioner may exercise the authority granted by the rules pertaining to the granting of a charter application only in the manner therein provided.

In *Bay City* the petitioners could demonstrate no harm by the failure of the Commissioner to set out underlying facts supporting a finding that was not in fact contested. Nevertheless, the Supreme Court held that the Commissioner's violation of the statute, without regard to harm, vitiated the entire order. That court said, "However, appellants and the court are not the only ones concerned with the Commissioner's order and his failure to follow the procedure required by law. *The public has an interest in the administrative decisions of State agencies, especially where they concern the public need for savings and loan agencies. We assume that the public also has a general interest in the laws of the State being followed as they are written.*" (emphasis supplied).

I would affirm the judgment of the trial court.