Smith v. Moody.

4-4271

Opinion delivered May 4, 1936.

*Marsh & Marsh,* for appellants.

*Harry C. Steinberg* and *C. E. Wright,* for appellee.

Smith, J. This suit was brought to cancel an oil and gas lease upon the ground that the present owners of the lease, and their predecessors in title have failed properly to explore and develop it. An understanding of the issues upon which the decision turns requires a somewhat extended statement of the facts.

J. C. Moody, the landowner and the lessor, executed an oil and gas lease on March 28, 1922, to H. M. Johnson, trustee, covering 360 acres of land. Johnson assigned the lease to Detroit-Summerfield Oil and Gas Company, which company assigned 20 acres of the lease to Imperial Oil and Gas Company. This last-named company completed three wells on this 20-acre tract—the last in May, 1923. This 20-acre lease was formally released and relinquished to the original lessor, and is not involved in this litigation.

On May 7, 1923, the Detroit-Summerfield Company assigned to H. E. Clark, an undivided one-half interest in the remaining 340 acres and on May 22, 1923, assigned the other undivided one-half interest to Terry-Summerfield Oil Company, a corporation.

In 1922, before making the two assignments last mentioned, the Detroit-Summerfield Company completed

two wells referred to as well No. 1 and well No. 2. From May, 1923, to March, 1925, Clark operated the property for the joint account of himself and the Terry-Summerfield Company and between June, 1923, and February, 1924, drilled six other wells referred to as wells Nos. 3, 4, 5, 6, 7 and 8. All of these wells except No. 8 were on the west property line of the lease. Well No. 8 was on the north line. No other wells have since been drilled. Clark operated all of these wells until March, 1925, except well No. 1, which was abandoned in 1924. In March, 1925, the remaining seven wells were turned over to the Terry-Summerfield Company and J. W. Wade was placed in charge of operations. He operated them for the joint account of the owners until February, 1934, with the exception of wells Nos. 2 and 4, which were abandoned in 1931. Well No. 8 was later abandoned in the same year. The derrick and equipment on well No. 5 burned in June of the same year, and was not operated until it was later reconditioned. From June, 1931, until February, 1934, the Terry-Summerfield Company continued to operate the three remaining wells, Nos. 3, 6 and 7, but not efficiently.

The Terry-Summerfield Company owned a lease on other lands referred to as the Smith Farm which had not been developed and operated to the satisfaction of the lessor, of which fact complaint had been made and Moody was invited to join in litigation to cancel both leases. On February 6, 1934, the Terry-Summerfield Company assigned its undivided one-half interest in the Moody lease, and the lease covering the Smith Farm to Patterson and Smith. The assignee Smith was one of the owners of the Smith Farm and appears to have been prompted in the purchase of these leases by the desire to have the Smith Farm lease properly developed. After acquiring the lease on the Smith Farm, and an undivided one-half interest in the other lease, Patterson and Smith junked and pulled the casings from the abandoned wells referred to above as wells 2, 4 and 8 and in May, 1934, rebuilt the derrick on well No. 5. They reconditioned wells 3, 6 and 7, and have operated these three wells and well No. 5 since doing so.

This suit was filed by the lessor, Moody, on January 28, 1935, for the purpose of cancelling the lease, and after hearing much testimony that relief was granted, except that the lease was not cancelled as to the forty acres on which the four wells last-above referred to are located. The storage tanks, tool house, boilers, pumps, pipe lines and other equipment are all located on the forty acres as to which the lease was not cancelled. This relief was granted upon the finding of fact contained in the decree ''that the defendants and their predecessors in title have failed to properly perform the implied covenants of the oil and gas lease herein involved for the exploration, development and operation of said oil and gas lease'' except as to the forty acres above mentioned which the assignees of the lease were allowed to retain.

It is not questioned that a breach of the implied covenant to explore and develop affords ground for the cancellation of an oil and gas lease. *Mansfield Gas Co.* v. *Alexander,* 97 Ark. 167, 133 S. W. 837; *Mansfield Gas Co.* v. *Parkhill,* 114 Ark. 419, 169 S. W. 957; *Miller* v. *Mauney,* 150 Ark. 161, 234 S. W. 498; *Ezzell* v. *Oil Associates Inc.,* 180 Ark. 802, 22 S. W. (2d) 1015. Nor is it questioned that these covenants or conditions require the exploration and development of the entire lease, and are continuing obligations resting upon the lessee and his assignees which are not satisfied by the development of a portion only of the leased property. The duties of the lessee and his assignee are defined in the cases just cited. See, also, *Drummond* v. *Alphin,* 176 Ark. 1052, 4 S. W. (2d) 942; *Standard Oil Company* v. *Giller,* 183 Ark. 776, 38 S. W. (2d) 766.

It appears from the facts stated that the last well drilled on the property was in February, 1924, which was nearly eleven years prior to the institution of this suit, and it does not appear to be seriously questioned that this delay would ordinarily support the finding that there had been a breach of the implied covenant to develop, if there were no facts to excuse the delay or which operated to estop the lessor from asserting there were grounds for forfeiture. It is very earnestly insisted that there is a valid excuse for the failure to fur-

ther develop, and that the lessor has estopped himself from claiming a forfeiture.

Much testimony was offered as to the necessity of drilling other wells, the contention being that the wells now producing were at the edge of the producing fields, and that new wells could not be drilled and operated except at great loss. This contention may be disposed of by saying that, if true, the lessees have not been damaged by the cancellation of so much of the contract of lease as cannot be profitably performed.

The serious question in the case is the one of fact, whether the lessor had estopped himself from claiming a forfeiture. The basis of this contention in substance is that the right to cancel the lease, if it exists at all, was known to the lessor before Patterson and Smith purchased their interest in it, and they were induced to purchase this interest through conduct on Moody's part leading them to believe that the validity of the lease was not and would not be questioned. Moody gave the Terry-Summerfield Company a lease on forty acres of land not here involved which it is said was a part of the consideration for the assignment by the Terry-Summerfield Company of the undivided one-half interest to Patterson and Smith, and it is argued also that after Patterson and Smith had purchased this one-half interest, Moody stood by and saw them expend large sums of money in reconditioning the wells that are now being operated. It is alleged also that Patterson and Smith were ready to begin drilling on the Smith Farm lease, and had made arrangements to drill a deeper well on the Moody lease which was not done because the institution of this suit prevented that action. It is argued also that the cancellation of the lease was inequitable because no demand had been made upon the lessees or their assigns to proceed with the development.

It appears reasonably certain, however, that the assignee, Smith, was fully apprized of the nondevelopment, and of the complaint on that account. Indeed, he was quite active in demanding the proper development of his family property, known as the Smith Farm and suggested to Moody that they bring suit to cancel both

leases in which Terry-Summerfield Company was interested. Complaint appears also to have been made to McFann, the agent of Clark, who owned the other undivided one-half interest, and this agent excused the delay by saying they would drill when and if they could get the Terry-Summerfield Company interest out of the way. McFann admitted that in 1930 or in 1931, Moody's son had taken up the question of drilling with him, and he stated that "we were ready to drill the east field, and if we could get the Terry-Summerfield out, we would go ahead."

It is true that Patterson and Smith spent a large sum of money on the wells now operating which greatly increased their production. But this appears to have been no more than their duty required as assignees of the lease. Besides they are the chief beneficiaries of this expenditure. The decree leaves these wells in their possession with the right to continue their operation.

Smith paid the Terry-Summerfield Company $2,000 in cash for the assignment to Smith and Patterson of the Moody lease and the Smith Farm lease, and in addition gave the Terry-Summerfield Company a lease on two forty-acre tracts not covered by any previous lease. Smith allocated $1,250 of this money to the Moody lease and $750 to the Smith Farm lease. Moody testified that he did not know that Patterson and Smith were buying the Terry-Summerfield lease until after they had bought it, and that he gave the Terry-Summerfield Company the lease on the additional forty acres to enable Clark to get Terry-Summerfield out of the way. There is considerable testimony more or less conflicting upon these questions of fact, but we are unable to say that the chancellor's finding thereon is contrary to the preponderance of the evidence. The wells now in operation were reconditioned not later than July, 1924, and nothing appears to have been said or done about further drilling and development until about January, 1935, when Smith and Patterson offered to assign their interest in 120 acres of the Moody lease to procure the drilling of other and deeper wells. But this litigation was then in the offing, and the offer of Patterson and Smith to procure some one

else to drill a well was but a belated offer to perform the duty of developing the lease under which the lessees and their assigns had at all times rested.

The finding of the court that there was a failure to discharge this duty does not appear to be clearly contrary to the preponderance of the evidence, and the decree must be affirmed.