Texas Gulf Producing Co. *v.* Griffith, et al.

June 8, 1953

No. 38712 34 Adv. S. 184 65 So. 2d 447

July 3, 1953 35 Adv. S. 15 65 So. 2d 834

110

*Bernard W. Chill, Bonner R. Landman* and *William H. Gordon,* Jackson, for appellant.

112

114

115

116

*Robert G. Livingston,* Prentiss, and *Hall & Callender,* Columbia, for appellees, B. C. Griffith and Roy E. Watson.

*Garner W. Green* and *Garner W. Green, Jr.,* Jackson, for appellee, Mrs. Geraldine B. Martin.

120

122

Brief for appellant.

126

Brief for appellee, Mrs. Geraldine B. Martin.

ORIGINAL OPINION

HOLMES, J.

On November 16, 1939, Estella Magee and her husband, Houston Magee, executed to J. E. Thrift, Jr. an oil, gas, and mineral lease on land in Jefferson Davis County, Mississippi, describing the same in the lease as follows:

"48 acres more or less. The same land and all of the land described in deed dated September 3, 1938 recorded in Book 43 at page 564 deed records Jefferson Davis County, Mississippi, from Anna Milloy et al to Estella Magee as the NE¼ of SE¼ Section 33 Township 9 north, range 19 west, and the south 8 acres of that certain 16 acres in the east side of the SE¼ of the NW¼ section 3, township 8 north, range 19 west, all in Jefferson Davis County, Mississippi."

The lease was what is known as an "unless" lease and was for a primary term of ten years, "and as long thereafter as oil, gas, or other mineral is produced from said land hereunder." The lease contained neither a pooling agreement nor a force majeure clause. The validity of the lease in its inception is not questioned. On October 7, 1940, J. E. Thrift, Jr. assigned the lease to Fohs Oil Company, which by corporate merger and change of corporate name became Texas Gulf Producing Company, and the latter company succeeded to the ownership of the lease. On the same date that the aforesaid lease was executed, towit, on November 16, 1939, the lessors, Estella Magee and her husband, Houston Magee, conveyed to Geraldine B. Martin, subject to said lease, an undivided one-half interest in the oil, gas and other minerals in the land described in said lease.

On July 1, 1944, Estella Magee and her husband, Houston Magee, conveyed to Charles F. Longino an undivided one-half interest in the oil, gas and other minerals in said land, reserving the right to execute future leases thereon and the right to all bonus money and delay rentals. Thereafter, and subject to like reservations as contained in the aforesaid conveyance to him, Charles F. Longino conveyed to Dewitt Smith on March 26, 1948, an undivided 1/48 mineral interest in said land, and to H. R. Hays on March 26, 1948, an undivided 1/48 mineral interest in said land, and on July 15, 1949, Dewitt Smith conveyed to W. J. Morris, subject to like reservations, an undivided 1/16 of ⅛ of 4/320 mineral interest in said land.

The land covered by the aforesaid lease is located in the Gwinville Gas Field, which embraces a large area of land in Jefferson Davis and Simpson Counties, Mississippi, and which came into production as a proven gas field in the year 1944.

Pursuant to the authority vested in the State Oil and Gas Board by Chap. 117 of the Laws of 1932 and Chap. 305 of the Laws of 1936, the Board, by its orders of August 30, 1945, August 28, 1946, August 11, 1947, and September 11, 1947, finding it necessary so to do to prevent waste and to protect the correlative rights and opportunities of owners of gas in the common source of supply, adopted rules and regulations applicable to the Gwinville Gas Field, providing that every gas well should be located on a drilling unit consisting of at least 320 contiguous surface acres upon which no other drilling or producible well is located, determining the efficient drainage area of each gas well to be 320 contiguous surface acres, providing for the application for and the granting of permits to drill, providing for the allocation of allowables for each gas well upon filing with the board for approval a plat showing the location of the well and the acreage assignable to it, defining an owner as the person who has the right to drill into and produce from a field or pool and to appropriate the

production either for himself or for himself and another, and providing for the filing of well completion reports.

By instrument dated December 12, 1947, the Texas Gulf Producing Company, holder of the lease here involved, and other lessees of contiguous lands, as non-operators, and the Humble Oil and Refining Company, a leaseholder of contiguous lands, as operator, entered into an agreement to pool and combine their leases as to gas rights into a unit of 320 acres known as Unit No. 14, in so far as lands covered by said leases are embraced therein, reciting therein that the Humble Oil and Refining Company had completed a gas well on the pooled unit known as the J. S. Hubbard, et al, No. 1 well, and providing that the operation of said well should be under the exclusive charge, control, and supervision of the Humble Oil and Refining Company.

On November 21, 1947, the Humble Oil and Refining Company had applied for, and on November 22, 1947, was granted, a permit to drill a gas well, stating the exact location thereof in the NE¼ of Section 33, Township 9 north, Range 19 west, Jefferson Davis County.

On January 10, 1948, there was filed with and approved by the Board a plat of Unit No. 14, containing 320 contiguous acres and embracing the NE¼ of the SE¼ of Section 33, Township 9 north, Range 19 west, or 40 acres of the land covered by the aforesaid lease dated November 16, 1939, and originally executed by Estella Magee and her husband, Houston Magee, to J. E. Thrift, Jr., but not embracing the other eight acres covered by said lease.

A well completion report dated January 16, 1948 was filed with and received by the Board on January 23, 1948, showing the completion on January 10, 1948 of the well drilled on said unit pursuant to said permit. Thereafter, allowables applicable to said well were set by the Board beginning January 26, 1948.

All the foregoing transpired during the primary term of the aforesaid lease dated November 16, 1939, and

prior to the effective date of Chap. 256 of the Laws of 1948. Thereafter, on June 23, 1950, on the application of Superior Oil Company, one of the interested lessees, and after a hearing pursuant to notice, the Board entered an order adjudging that the aforesaid drilling Unit No. 14 had been therefore legally established and ordering the integration of the interests embraced therein.

The said Geraldine B. Martin declined to enter into a voluntary pooling agreement as to the lands in which she owned a ½ mineral interest, and has declined to accept the tender of royalty payments under the lease of November 16, 1939. The unit well is located on land other than that covered by the lease of November 16, 1939.

On November 26, 1949, Estella Magee and her husband, Houston Magee, executed to Roy E. Watson an oil, gas, and mineral lease on an undivided ½ interest in the same lands covered by the aforesaid lease originally executed to J. E. Thrift, Jr., which lease so executed to Roy E. Watson was assigned by him on December 17, 1949 to B. C. Griffith to the extent of a ½ interest therein.

After the expiration of ten years from November 16, 1939, the date of the Thrift lease, and after the appellees Roy E. Watson and B. C. Griffith acquired from Estella Magee and her husband, Houston Magee, the aforesaid lease dated November 26, 1949, the appellees filed their bill in chancery praying an adjudication that the said Thrift lease had terminated by its terms, and asking to have the same cancelled as a cloud upon their asserted title to a leasehold estate under the aforesaid lease of November 26, 1949. In the original bill and subsequent pleadings, the Texas Gulf Producing Company and numerous other parties were named as defendants to the action, among them Geraldine B. Martin. Through disclaimers filed, the suit resolved itself into a controversy between the Texas Gulf Producing Company on the one hand, and Roy E. Watson, B. C. Griffith, and Geraldine

B. Martin on the other hand. Upon hearing the case, the chancellor granted the relief prayed for by Roy E. Watson and B. C. Griffith, and by Geraldine B. Martin in her cross-bill, and from this decree the Texas Gulf Producing Company prosecutes this appeal. During the pendency of this appeal, the appellee Roy E. Watson died and this cause as to the said Roy E. Watson has been revived in the name of Mrs. Lorraine B. Watson, executrix of the last will and testament of Roy E. Watson, deceased.

The appellant contends on this appeal (1) that the trial court was without jurisdiction of this cause because of the absence of necessary parties, and (2) that the deed from Estella Magee and her husband to Charles F. Longino was a mineral deed and not a royalty deed and that, therefore, the execution by Longino and his assignees of the pooling amendment to the Thrift lease was a valid exercise of their rights as the owners of the fee in the minerals, and the purported oil, gas, and mineral lease executed by Estella Magee and her husband to Roy E. Watson was of no effect, and (3) that the Thrift lease dated November 16, 1939 did not terminate at the expiration of its primary term on November 16, 1949, for the reason that land covered thereby had been previously included in an established drilling unit, towit, Unit No. 14, and that since January 10, 1948 gas was being produced therefrom, and that such production was from the land covered by the lease and continued the lease in force.

We think that the contention that the trial court was without jurisdiction of this cause because of the absence of necessary parties is untenable. This was a suit to remove clouds and not to quiet or confirm title. Any intention on the part of the appellees to affect the title of absent parties is wholly disclaimed. Moreover, ▆▆▆ in suits to remove clouds, the claimant may proceed against any one of several who may be asserting an adverse claim,

and in such cases it is necessary to join as defendants only those parties who are asserting an adverse claim or hold such record evidence of title as should be cancelled as a cloud. McLendon v. McGee, 189 Miss. 712, 198 So. 725; Griffith's Chancery Practice, 2d Ed., p. 113, Sec. 115. The primary purpose of this suit is to obtain an adjudication of the termination of the Thrift lease at the expiration of its primary term and to cancel the same as a cloud upon the asserted title of claimants insofar as it affects the adverse claims of named defendants and we think the claimants had the right to proceed against such of those as were asserting an adverse claim. We are of the opinion, therefore, that the trial court was not without jurisdiction of this cause because of the absence of necessary parties.

The contention of the appellant that the Thrift lease dated November 16, 1939, was extended and continued in force beyond its primary term because during its primary term and prior to the effective date of Chap. 256 of the Laws of 1948, a part of the land covered by said lease was included in an established drilling unit, to-wit, Unit No. 14, under the rules and orders of the State Oil and Gas Board, and production was and is being had from land within the drilling unit of which the leased land forms a part, is sound insofar as it affects the leased land within the unit and must be sustained under the prior decisions of this Court, holding that such production is deemed to be from the leased land within the unit. We need not detail the various grounds of attack made by the appellees upon the validity of the establishment of the unit and the effect thereof, since they have been decided adversely to the contentions of the appellees in our said prior decisions. California Co. v. State Oil and Gas Board, 200 Miss. 824, 27 So. 2d 542; Green v. Superior Oil Company, 59 So. 2d 100; Superior Oil Company v. Foote, 214 Miss. 857, 59 So. 2d 85; Superior Oil Company v. Beery, 63 So. 2d 115 (suggestion of error over-

ruled April 27, 1953). In Superior Oil Company v. Beery, supra, we said:

"And what we are now holding is that the effect of the establishment of a drilling unit of a given area and the prevention of the drilling of more than one well thereon is to necessarily pool the rights of the oil and gas lessees and all of the mineral rights in such area, because any other result would mean that only the oil and gas lessee that drilled the unit well could receive any portion of the $\frac{7}{8}$ of the gas produced therefrom, and only the owners of the minerals under the particular tract on which the well is drilled could receive any portion of the royalties from production, since it is only upon the theory that all other interests of the oil and gas lessees and of all other royalty interests have been pooled with the Dale tract that they can participate in the production from the Dale well."

In the opinion overruling the suggestion of error in Superior Oil Company v. Beery, supra, we further said: "The present decision, holding that the effect of the establishment of the drilling unit is to pool all interests in the unit and thereby to extend the terms of all leases then in effect, is a logical and necessary step in the light of all of the foregoing cases, and is essential in giving practical effect to the establishment of the unit. In brief, production on the unit is the equivalent of production on appellee's land."

The question is presented, however, as to whether the production from Unit No. 14, which incorporated only a part of the leased land, extended the primary term of the lease of November 16, 1939, as to all of the leased land whether within or without the unit. We deal with the question only as it arises out of the particular facts of this case. The appellant, by agreement with other lessees of contiguous lands and with approval of the State Oil and Gas Board, acting pursuant to the authority vested in it by Chap. 117 of the Laws of 1932 and

Chap. 305 of the Laws of 1936, effected the establishment of a drilling unit, that is to say, Unit No. 14, which incorporated only 40 acres of the 48 acres covered by the Thrift lease, and the result of which was to pool or unitize all interests within the unit area. Only one well was permitted to be drilled on the unit consisting of 320 contiguous surface acres, and the efficient drainage of such well was determined under the rules and regulations of the State Oil and Gas Board to be 320 contiguous surface acres. The well was drilled on the unit on land other than the leased land embraced therein. The issuance on application of the permit to drill the well, the drilling and completion of the well, the filing and approval of the plat of the unit area, and the fixing of allowables for the well all transpired during the primary term of the Thrift lease. Production from the well, under the prior decisions of this Court, was deemed production from that part of the leased land within the unit. No other well could be drilled on the leased land within the unit. If the production from the unit well is to be held to continue in force the lease as to the 8 acres which are outside the unit and located about three-fourths of a mile from the other 40 acres, then the lessee may hold the lease in force indefinitely as to said 8 acres without any obligation to drill thereon, except such as may be required of a prudent operator in the development and protection of the land from drainage, and without any obligation to pay delay rentals thereon during the remainder of the primary term of the lease, and without any obligation to pay royalties or other compensation or benefits to the lessors, or royalty or mineral holders. Appellant has not sought an exception under the spacing regulations to drill on said 8 acres, and did not incorporate said 8 acres in another drilling unit until after the expiration of the primary term of the lease. The 8 acres were not drained by the unit well, and there was no production therefrom during the primary term. Appellant elected during the

primary term to incorporate the 40 acres in a drilling unit and to leave the 8 acres out. To hold that the lease was continued in force indefinitely as to the 8 acres without the payment of royalty or rentals or other benefits therefrom as the result of the establishment of the unit incorporating the 40 acres and the compulsory pooling resulting therefrom, when no well was drilled on the leased land, would be to apply our conservation laws in violation of the constitutional guaranty that no person shall be deprived of his property without due process of law. The basis of our prior decisions in upholding the establishment of drilling units and the compulsory pooling resulting therefrom is that a mineral owner is not deprived of a valuable property right by the failure to produce oil or gas from his land in the unit by a well thereon when he is permitted to receive the equivalent thereof from the unit well. In Superior Oil Company v. Beery, 63 So. 2d 115, the Court said:

"It follows from what is said in the foregoing paragraph that a land or mineral owner is not deprived of any valuable property right in violation of due process of law because of the failure to produce oil or gas from his tract of land by a well thereon, when he is allowed to receive the equivalent thereof from a unit well on adjacent land in furtherance of the public policy of the State in the conservation of its natural resources. We recognize that in the absence of such laws enacted in the exercise of the police powers of the State, the appellee would have been entitled to the reversionary interest in his minerals after December 29, 1949, if no production of oil, gas or other mineral was had from a well on his mineral acres. But Chapter 305, Laws of 1936, made it the 'duty of the Board to prorate and regulate the gas well production from each common source of supply . . ., for the protection of public and private interest, and to adjust the correlative rights and opportunities of each owner of gas in a common source of supply. . . .'

These conservation laws and regulations are based upon the theory that an individual having a right under given circumstances may exercise even the higher right of giving up the asserted right in the interest of the public welfare. Such was the philosophy of the moratorium statutes under which holders of mortgages and deeds of trust, giving unto them the right to foreclose in the default of a payment of an indebtedness, were denied the right to do so upon compliance with certain requirements not provided for in the contract of security.

"An attribute of sovereignty, such as the police power of the state to conserve its natural resources, needs no constitutional sanction for its valid exercise; it is a power inherent in the existence of a government."

Our conservation laws were enacted to be fair and reasonable and to do justice and equity to all parties concerned, and we think that it was not contemplated under the statutes authorizing the establishment of drilling units and the compulsory pooling resulting therefrom that the establishment of the unit and the production from a well on land therein other than the leased land should affect the leased land without the unit. Particularly is this true because if the production from such unit well were to be held to keep the lease in force indefinitely as to the leased land without the unit, the lessor would be deprived of the right to drill on the leased land without the unit, and deprived of any royalties, rentals, or benefits therefrom. Under such interpretation, if a lease covered segregated tracts aggregating 1,000 acres and 40 acres thereof were placed in a drilling unit, and production should be had on land within the unit but not on the 40 acres, the lease might be continued in force indefinitely beyond the primary term as to the entire 1,000 acres, without any royalties, rentals, or other benefits to the lessor, or royalty and mineral owners, as to the 960 acres without the unit. To give this effect to the establishment of the unit under the facts of this case would, in

our opinion, be a violation of the constitutional guaranty that no person shall be deprived of his property without due process of law. It is our conclusion, therefore, that the Thrift lease was not, under the facts of this case, continued in force beyond its primary term as to the 8 acres therein described, but that as to said 8 acres, the said lease terminated at the expiration of the primary term of the lease.

After the expiration of the primary term of the Thrift lease, the 8 acres covered by said lease were unitized with other lands and included in Unit No. 41. Appellees, however, do not question or seek to cancel any unitization becoming or made effectual after the expiration of the primary term of the Thrift lease, and hence we only comment that the rights of the parties with respect to the 8 acres embraced in Unit No. 41 will be governed by the views expressed by us in this opinion.

The conclusions herein before reached render it unnecessary for us to construe the instrument executed to Charles F. Longino by Estella Magee and her husband, Houston Magee.

For the reasons hereinbefore set forth, the decree of the court below is affirmed as to the 8 acres embraced in the Thrift lease, and as to the 40 acres embraced therein the decree of the court below is reversed and judgment entered here for the appellant in accordance with the prayer of its cross-bill. The appeal costs should be taxed one-half against the appellant and one-half against the appellees.

Affirmed in part and reversed in part.

All Justices concur except *Hall, J.,* who took no part.

## OPINION ON SUGGESTION OF ERROR

McGEHEE, C. J.

We have given careful and painstaking consideration to the suggestions of error filed on behalf of the appellant, Texas Gulf Producing Company, and the appellee, Geraldine B. Martin, and we have reached the conclusion that both suggestions of error should be overruled.

The appellant, however, urges upon us the necessity that this Court construe the instrument executed by Estella Magee and her husband, Houston Magee, to Charles F. Longino, dated July 1, 1944, and we yield to this in order to clarify our holding that the decree of the court below should be affirmed as to the 8 acres here involved.

The appellees, Roy E. Watson and B. C. Griffith, sought by their original bill filed in this cause to cancel the Thrift lease dated November 16, 1939 as a cloud upon their asserted title to the leasehold interest under the lease executed to Roy E. Watson by Estella Magee and her husband, Houston Magee, dated November 26, 1949, covering an undivided ½ interest in the oil, gas and other minerals in the entire 48 acres here involved. In order to prevail, it was necessary that appellees show a perfect title in themselves, Nicholson v. Myres, 170 Miss. 441, 154 So. 282, and that the Thrift lease had terminated. This they succeeded in doing as to the 8 acres unless the Magees, by the execution of the aforesaid instrument to Charles F. Longino, had divested themselves of the leasing rights which remained in them after conveying an undivided ½ interest in the minerals to Geraldine B. Martin. We are of the opinion that they had not so divested themselves of such leasing rights for the reason that the instrument executed by them to Charles F. Longino was a royalty conveyance and not a mineral deed, and that the same validly reserved in the Magees the right to execute future leases.

This brings us to a consideration of the nature of the instrument executed by the Magees to Charles F. Longino under date of July 1, 1944. This instrument is headed "Royalty Deed." The instrument, excluding the signatures and acknowledgment thereof, is as follows:

"ROYALTY DEED

"KNOW ALL MEN BY THESE PRESENTS:

"THAT Stella Milloy Magee and husband Houston Magee for and in consideration of the sum of Ten Dollars ($10.00) DOLLARS, to us cash in hand paid by Charles F. Longino the receipt of which is hereby·acknowledged, do hereby grant, bargain, sell, and convey unto the said Charles F. Longino and unto his heirs and assigns forever, SUBJECT, HOWEVER, to all of the terms, conditions and reservations hereinafter mentioned, AN UNDIVIDED One half (½) interest in and to all of the oil, gas and other minerals, in, under and upon the following described lands situated in Jefferson Davis County, in the State of Mississippi:

"NE¼ of SE¼ section 33, Township 9 North Range 19 West and the south 8 acres of that certain 16 acres on the east side of SE¼ of NW¼ section 3 Township 8 North Range 19 West containing in all 48 acres more or less.

"It is the intention of the Grantors herein to convey by these presents and they do convey by these presents 24 mineral acres.

"The grantors herein expressly reserve to themselves their heirs or assigns, the exclusive right to lease said lands, or any part thereof, for oil and gas purposes, without interference or hindrance upon the part of the grantee, his heirs or assigns; and the grantee herein, his heirs or assigns shall never be entitled to receive any part of the consideration,. cash or otherwise, paid or to be paid, for any oil gas mining lease heretofore or hereafter executed covering said land, or any part thereof,

nor shall the grantee, his heirs or assigns, ever be entitled to receive any part of any delay rentals to defer the commencement of drilling operations provided by any such lease; and the grantee herein, his heirs or assigns, shall not be required to join in the execution and delivery of any oil and gas mining lease covering said land, or any part thereof, in order to convey good title to lessee thereunder; PROVIDED, that the grantors herein expressly covenants with the grantee that no oil and gas mining lease shall ever be executed covering the above land, or any part thereof, that shall reserve to the grantors herein, their heirs and assigns, as royalty, less than one-eighth of all of the oil and gas produced and saved from said land and that this covenant shall be deemed a covenant running with the land.

"It is the intention of the parties hereto that the grantee herein, his heirs, or assigns, shall be entitled to receive hereunder one-half (½) of all oil and/or gas run to the credit of the royalty interest reserved under and by virtue of any oil and gas mining lease now in force and effect covering said land, and under any oil and gas mining lease hereafter executed covering said land, or any part thereof; and in any event the grantee herein, his heirs or assigns, shall be deemed the owner of and shall be entitled to receive part of all oil and gas produced and saved from said land, or any part thereof.

"TO HAVE AND TO HOLD the above described property and property interest together with all and singular the rights and appurtenances hereunto belonging, unto the said Charles F. Longino, his heirs, and assigns forever.

"And they hereby covenant with the said Charles F. Longino that we will forever warrant and defend the title to the above described lands and the rights herein conveyed against all lawful claims whatever.

"Witness our signatures on this 1 day of July, 1944."

 In construing the aforesaid instrument, it is necessary under well recognized rules of construction that the same be construed as a whole, and that the intent of the parties thereto be gathered from the plain and unambiguous language therein employed. In 26 C. J. S., page 328, we find the following: "A deed must be construed as a whole, without separating it into its formal parts. The intent must primarily be gathered from a fair consideration of the entire instrument and the language employed therein . . ."

We held in the case of Goff v. Avent, 122 Miss. 86, 84 So. 134, that when the meaning of language is to be determined by the Court, the intent of the parties, expressed in the words they have used, must govern. Again we said in the case of Gulf and S. I. R. Co. v. Patten, et al, 180 Miss. 756, 178 So. 468, as follows: "In construing deeds, the intention of the parties is sought to be effectuated, of course, but this intention must be found in the language of the instrument; so that effect must be given if possible to each item of the written contents, and no item shall be stricken or rejected so long as it may be harmonized with the other items."

 Applying these rules of construction to the instrument under review, we find no difficulty in determining the instrument to be a royalty conveyance and not a mineral conveyance. The parties themselves have denominated the instrument a "royalty deed." The granting clause of the instrument is expressly made subject to the terms, conditions, and reservations thereinafter mentioned. The instrument reserves in the grantors the exclusive right to lease the lands therein described for oil and gas purposes. All bonus money paid for future leases and all delay rentals under any oil and gas lease on the lands are reserved to the grantors. In granting future leases, the grantors are required under the expressed terms of the instrument to reserve as royalty not less than ⅛ of all of the oil and gas produced and saved from the

land. It is expressly declared in the instrument that it is the intention of the parties thereto that the grantee shall be entitled to receive one-half of all oil and/or gas run to the credit of the royalty interest reserved under and by virtue of any oil and/or gas lease in force or subsequently granted. Thus it is manifest from the entire instrument and the plain language thereof that the parties intended by said instrument to vest in the grantee a royalty and not a mineral interest.

We are, therefore, of the opinion that at the time of the execution by the Magees of the lease to Roy E. Watson, dated November 26, 1949, the Magees were vested with the leasing rights with respect to the mineral interest therein described, subject to the prior Thrift lease, and that since the Thrift lease has terminated as to the 8 acres here involved, the lease so executed by the Magees to Roy E. Watson dated November 16, 1949, should be and it is held to be a valid lease as to said 8 acres.

Accordingly, both of the suggestions of error herein filed are overruled.

Suggestions of error overruled.

All Justices concur except Hall, J., who took no part.

———

ETHRIDGE, J. specially concurring:

I concur with the original decision and that on suggestion of error. The following states my understanding of what we decide.

Appellant, Texas Gulf Producing Company, argues that, when the 40 acre tract was incorporated into Unit 14, and that unit became producing by the drilling of a unit well not on the 40 acre tract, this production constituted production not only under the leased lands within the unit, but also fixed the term and preserved the lessee's estate under the entire lease including that in the 8 acre tract under lease outside of the unit.

At common law and under the usual habendum clause in an oil and gas lease, one producing well during the primary term on any part of the lease will continue the lease in effect as an entirety. The provision fixing the term of the lease is ordinarily considered indivisible. And in several cases the Louisiana Courts have held that where part of leased lands is incorporated in a compulsory unit, and a producing well is drilled in the unit not on the leased lands therein, such production continues the lease in effect as to both the lands in the unit and outside the unit. Hunter Co., Inc. v. Shell Oil Company, Inc., 211 La. 893, 31 So. 2d 10 (1947); Le Blanc v. Danciger Oil & Ref. Co., 218 La. 463, 49 So. 2d 855 (1950); Smith v. Carter Oil Co., 104 F. Supp. 463, (D. C. W. O. La., April 10, 1952). See also Gray v. Cameron, 234 S. W. 2d 769 (Ark. 1950). However, those cases dealt with orders of the Louisiana Commissioner of Conservation which expressly provided that production within the unit should continue all leases affected thereby in effect. And the Louisiana compulsory pooling statutes then in existence expressly so provided. But in the instant case, neither the order of the State Oil and Gas Board nor the Mississippi conservation statutes of 1932 and 1936 expressly so provide.

In order to reach the suggested result, the Court would have to imply from the 1932 and 1936 conservation statutes, and the rules of the Board thereunder, not only that production within the unit constitutes production under each tract therein, which has already been decided by this Court, but also would have to imply that units so created under the 1932 and 1936 conservation statutes, in which production was had not on leased lands therein, would continue the lease in effect as to leasehold lands outside of the unit. I do not think that this implication is warranted by the 1932 and 1936 statutes and the rules of the Board. The orders of the Board in question and the actions of the lessee concerning Unit 14 were re-

stricted to property within the unit. The aforesaid doctrine of indivisibility of the obligations of the lease is applicable only between the contracting parties and their successors in interest. The situation in the instant case was not caused by the lessor, but was brought about by the actions of appellant, lessee, the statutes, and the intervention of the State Oil and Gas Board in the exercise of the police powers of the state. The division of obligations of the lessee was effectuated by these statutes, the actions of the Board and of appellant, lessee.

It may be that the Legislature has the power to provide that production as in the instant case would continue the lease as to lands outside the unit. It is my understanding of the present decision that we do not consider here either that issue or whether the 1950 compulsory pooling act so provides; nor do we consider whether a producing well on the leased lands in the unit continues the lease on lands outside of it. We are now holding simply that we are not willing to imply from the general terms of the 1932 and 1936 statutes, and the supplementary rules of the Board under that legislation, that the Legislature intended that production not on the leased lands within the unit would continue the lease as to lands not within the unit.