Ivy Ellis MIZE and wife, Voncile Mize,
Plaintiffs-Appellants,

v.

EXXON CORPORATION,
Defendant-Appellee.

No. 78–3616.

United States Court of Appeals,
Fifth Circuit.

March 25, 1981.

James E. Hart, Jr., Brewton, Ala., for plaintiffs-appellants.

Ben H. Harris, Jr., Charles B. Bailey, Jr., Mobile, Ala., for defendant-appellee.

Before TJOFLAT, POLITZ and HATCHETT, Circuit Judges.

POLITZ, Circuit Judge:

In this diversity suit Ivy Ellis Mize and Voncile Mize seek damages and partial cancellation of an oil, gas and mineral (OGM) lease covering certain properties in Alabama. The Mizes contend that Exxon failed to protect their land against drainage by wells drilled in the area and failed to develop the leased property in a reasonable manner. The district court granted Exxon's motion for summary judgment and dismissed the Mizes' complaint. We affirm in part, reverse in part and remand.

### A. Background

In February 1973 the Mizes executed an OGM lease in favor of Exxon covering two tracts of land in Township 1 North, Range 8 East, Escambia County, Alabama. After the instant suit was filed Exxon released its lease rights over one tract, the Northeast Quarter of the Southeast Quarter of Section 26, and over a portion of the second tract located in the Southeast Quarter of Section 36. The vortex of the present dispute is approximately 39 acres in Section 36 which have not been released from the lease.

On December 7, 1973, pursuant to Order No. 73-61, extensive acreage adjacent to Section 36 was placed within a drilling unit established by the State Oil and Gas Board of Alabama (Board).[1] Effective March 1, 1974, by Order No. 74-48, additional property, including 40 acres comprising the Southeast Quarter of the Southeast Quarter of Section 36, was placed within the unit by the Board. The effect of the two Orders was to unitize all interests encompassing the Smackover-Norphlet Oil Pool within the Jay Field in Santa Rosa and Escambia Counties, Florida, and the Little Escambia Creek Field in Escambia County, Alabama. The entirety of the Mize property in Section 36 leased to Exxon is included within the "Unit Area," however, less than one acre is within the "Productive Limit." Only acreage within the periphery of the Productive Limit shares in the proceeds from successful drilling operations. The Mizes' interest in production from the unit in the current phase of development is .000069. The Unit Agreement which was approved by the Board in Order No. 73-61, as amended, defines the Unit Area and the Productive Limit. Pertinent extracts include:

*Procedure Used in Designating Unit Area* : The Unit Area includes the entirety of each drilling unit on which there is a productive well and the entirety of all other Tracts which are wholly within the area defined by the productive limit shown on Exhibit A. A parcel of land which is not part of a drilling unit and in which there is common ownership and which lies partly within and partly without the said productive limit is included within the Unit Area as a Tract to the extent that the parcel lies contiguously within a regular governmental quarter-quarter section (or quarter of a projected hypothetical 160-acre drilling unit wherever a regular governmental quarter-quarter section does not exist) in which some portion of said parcel is within the productive limit.

*Productive Limit* : The periphery of the composite area occupied by total Productive Acres within the Unit Area. Productive Acres are those acres underlain by oil, gas, gaseous substances, sulphur, condensate, distillate, and all associated and constituent liquid or liquefiable substances within or produced from the Smackover-Norphlet Oil Pool. [A summarization, for purposes of clarity, of Article 1, sections 1.1, 1.3 and 1.16 and Exhibit C of the Unit Agreement.]

---

1. Although the Mizes correctly point out that the Unitization Agreement was not *executed* by them, we are not convinced that this situation can be designated a forced or compulsory unitization. Paragraph 4 of the lease specifically granted Exxon "the right, at its option, to pool or unitize all or any part of said land and of this lease as to any or all minerals or horizons thereunder, with other lands, lease or leases, or portion or portions thereof, or mineral or horizon thereunder." The question remains purely academic, however, as it has no impact on our decision. In any event the Mizes, by accepting royalties, may be said to have implicitly ratified the agreement and are bound by its terms. *See Klippel v. Beinar*, 222 Kan. 681, 567 P.2d 867 (1977); *Dobbins v. Hodges*, 208 La. 143, 23 So.2d 26 (1945).

To date Exxon has drilled numerous producing wells within the unit, at least six of which are located within 1700 to 5200 feet of Section 36. No well is located on property owned by the Mizes. In this connection the Mizes resolutely maintain that oil, gas and other hydrocarbons exist beneath that portion of the unitized area of Section 36 which is outside the productive limit and, therefore, that they are entitled to damages from Exxon for the unlawful appropriation of those minerals in two respects: first, as a result of drainage by wells drilled over the Jay and Little Escambia Creek Fields; and second, as a result of drainage by wells located over the Fanny Church Field.[2]

The Mizes further contend that the lease lapsed on October 1, 1976, the expiration date of the three-year primary term. The lease contains the following provisions for an extension beyond the primary term:

Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of 3 years from Oct. 1, 1973, hereafter called "primary term," and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

... Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

... Any operations conducted on any part of ... unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted under this lease.

Contending that Exxon breached its obligations under the lease to protect their interests, the Mizes assert that the lease is not extended beyond the primary term. This assertion is predicated on a dual-pronged theory because it involves the existence *vel non* of two distinct implied covenants: the duty to drill off-set wells to prevent drainage and the duty to develop reasonably the leased acreage.

### B. *Damages for Drainage*

Notwithstanding the inherent appeal of an allegation of uncompensated drainage, the question before the court is not whether such drainage occurred but whether the Mizes are to be permitted, in this forum, to complain that their land was not included in the productive limit. We are convinced that they may not now pursue that claim in federal court.

Alabama law provides for the Board's issuance of orders creating units. These orders are subject to judicial review in the manner provided by Ala. Code tit. 26, § 179(38) (1958) (now Ala. Code § 9–17–15 (1975)):

Any interested person aggrieved by any rule, regulation or order made or promulgated by the board under this article and who may be dissatisfied therewith shall within 30 days from the date said order, rule or regulation was promulgated, have the right, regardless of the amount involved, to institute a civil action by filing a complaint in the circuit court of the county in which all or part of

2. Subsequent to formation of the Jay and Little Escambia Creek Fields Unit, the Board recognized the Smackover Oil Pool as also being within the Fanny Church Field. In their brief the Mizes contest the propriety of summary judgment, claiming the trial court failed to decide, and therefore a factual question exists, whether there is drainage from Section 36 by wells over the Fanny Church Field. This argument flows from an apparent misunderstanding of the trial court's ruling. Finding of Fact No.

6 reflects acceptance of evidence that Fanny Church Field encompasses Section 36. Conclusion of Law No. 6 is founded on the assumption that "productive hydrocarbons are present under the plaintiffs' lands within the unitized area but outside the production limit lines and ... that such hydrocarbons have been or are now being drained." There can be no doubt but that the trial judge included the Fanny Church Field in his assumption of drainage.

the aggrieved person's property affected by any such rule, regulation or order is situated to test the validity of said rule, regulation or order promulgated by the board. Such civil action shall be advanced for trial and be determined as expeditiously as feasible, and no post-ponement or continuance thereof shall be granted except for reasons deemed imperative by the court. In such trials the validity of any rule, regulation or order made or promulgated under this article shall be deemed prima facie valid, and the court shall be limited in its consideration to a review of the record of the proceedings before the board, and no new or additional evidence shall be received.

The reviewing court shall limit its consideration to the following:

(1) Whether the rule, regulation or order is constitutional;

(2) Whether the rule, regulation or order was without or in excess of jurisdiction;

(3) Whether the rule, regulation or order was procured by fraud;

(4) Whether the rule, regulation or order is reasonable; and

(5) Whether the rule, regulation or order is unsupported by the evidence.

The judicial review provided by Alabama law is specifically limited to a consideration of the proceedings and evidence before the Board and is not a trial *de novo.* Orders by administrative agencies frequently are subject to limited judicial review and generally are not subject to collateral attack.[3] The Mizes attempt to pursue such an attack. We conclude that they may not do so. The decision of the district court insofar as it grants the summary judgment and dismisses the claim for damages is correct and is affirmed.

### C. Lapse of the Lease

Having concluded that the Mizes may not collaterally attack the order designating the productive limit line, we now address what we perceive to be the most serious issue presented in this case. Has Exxon conducted "operations" on the Mize property so as to extend the lease beyond the primary term, and if so, has there been a breach of any covenant which warrants cancellation of the lease?

### 1. Extension Beyond Primary Term

█ A plethora of cases have firmly established the doctrine that operations conducted on any part of unitized acreage, even though not on the land under the lease in question, fulfill the indivisible obligation of the lessee and hold the entire lease beyond the primary term. This result has been affirmed whether the leased tract lies entirely within the unit, *Whitaker v. Texaco, Inc.*, 283 F.2d 169 (10th Cir. 1960); *Boutte v. Chevron Oil Company*, 316 F.Supp. 524 (E.D.La.1970), *aff'd*, 442 F.2d 1337 (5th Cir. 1971); *Harper v. Hudson Gas & Oil Corporation*, 189 F.Supp. 781 (W.D. La.1960), *aff'd*, 299 F.2d 238 (5th Cir. 1962); *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684 (1959), or only partially within the unit, *Scott v. Pure Oil Co.*, 194 F.2d 393 (5th Cir. 1952); *Broussard v. Amerada Petroleum Corporation*, 350 F.Supp. 104 (W.D.La. 1972); *Gray v. Cameron*, 218 Ark. 142, 234 S.W.2d 769 (1950); *Somers v. Harris Trust & Savings Bank*, 1 Kan.App. 397, 566 P.2d 775 (1977). We are aware of only one jurisdiction which has declined to adopt this rule, *Texas Gulf Producing Co. v. Griffith*, 218 Miss. 109, 65 So.2d 447 (1953).

█ We note the foregoing authorities primarily to reflect that the language of the lease in question is consistent with the majority rule. The lease between Exxon and the Mizes specifically provides that "any operations conducted on any part of

---

**3.** Cases holding that orders of oil and gas boards or commissions are not subject to collateral attack include: *Boutte v. Chevron Oil Company*, 316 F.Supp. 524 (E.D.La.1970), *aff'd*, 442 F.2d 1337 (5th Cir. 1971); *Breaux v. Apache Oil Corporation*, 240 So.2d 589 (La. App.1970); *Armstrong v. High Crest Oils, Inc.*, 164 Mont. 187, 520 P.2d 1081 (1974); *Exxon Corp. v. First Nat. Bank of Midland*, 529 S.W.2d 110 (Tex.Civ.App.1975); *Mitchell and Wyoming Comm'n v. Simpson*, 493 P.2d 399 (Wyo.1972).

such unitized land shall be considered ... operations conducted under this lease." We find that the lease is extended beyond its primary term by "operations" as envisioned in the lease agreement.

### 2. Breach of Implied Covenant

■ Determining that the lease continues beyond the primary term does not conclude our inquiry. We must examine the inherent rights of lessors to reasonable development of their property when they grant an OGM lease. In a case in which it applied the majority rule above (that drilling anywhere within the unit extends the lease on land both within and without the unit), one court stated, "The rationale of the majority rule is recognition by the courts that the implied covenants for reasonable development and protection against drainage apply to leased lands outside of pooled units ...." *Clovis v. Pacific Northwest Pipeline Corp.*, 140 Colo. 552, 556, 345 P.2d 729, 730 (1959). The rule imposing a duty of reasonable development is widely recognized.[4] The obligation of reasonable development is imposed upon lessees "because the failure further to drill might leave untapped oil which could be produced, or result in permanent loss of otherwise recoverable oil or a slower rate of production, thus depriving the lessor of the use of the capital represented by the unproduced royalty oil." *Willingham v. Bryson*, 294 S.W.2d 421, 423 (Tex.Civ.App.1956), *overruled on other grounds, Clifton v. Koontz, supra*. It is precisely because of the state's interest in preventing loss or waste of minerals that the Board is authorized to establish drilling units. *See* Ala. Code § 9–17–82 (1975).

■ The essential question before us is whether the implied covenant of reasonable

development, which would otherwise pervade the performance of an OGM lease, is somehow muted or abated by the presence of a unitization order. We hold that the lessee's obligation to develop reasonably exists whether or not there is a pooling or unitization order.

■ Exxon correctly points out that one of the principal legal consequences of unitization is that it relieves the lessee of (1) "the usual obligation of an implied covenant for reasonable development of each tract separately"; and (2) "the obligation to drill off-set wells on other included tracts to prevent drainage by a well on any included tract." *Klippel v. Beinar*, 222 Kan. 681, 685, 567 P.2d 867, 869 (1977), *citing Southland Royalty Co. v. Humble Oil & Refining Co.*, 151 Tex. 324, 249 S.W.2d 914 (1952). However, this release from the obligations to develop "each tract separately" and to "prevent drainage" does not extend to acreage outside the revenue sharing unit or, as it is referred to in this case, the productive limit. Presumptively, the very purpose of unitization, whether voluntary or enforced, is to determine and place within a productive unit the area to be drained. The exclusion of land from within a unit is, necessarily, a determination that it will not be drained by a well or wells on the adjacent properties. Therefore, in the usual situation, development inside the unit is insulated from, if indeed not the antithesis of, development outside the unit.

In the case before us the Unit Agreement provides in § 3.8: "Development Obligation. Nothing herein shall relieve [Exxon] from any obligation to develop reasonably the Unit Area." The 39 acres in question are within the Unit Area although outside the productive limit. Exxon has the obligation

---

4. *Sauder v. Mid-Continent Corp.*, 292 U.S. 272, 54 S.Ct. 671, 78 L.Ed. 1255 (1934); *Sinclair Oil & Gas Company v. Masterson*, 271 F.2d 310 (5th Cir. 1959), *cert. denied*, 362 U.S. 952, 80 S.Ct. 864, 4 L.Ed.2d 870 (1960); *Buchanan v. Sinclair Oil & Gas Company*, 218 F.2d 436 (5th Cir. 1955); *Humble Oil & Refining Co. v. Romero*, 194 F.2d 383 (5th Cir. 1952); *Cowden v. Texas Development Co.*, 89 F.2d 947 (5th Cir. 1937); *Trust Co. of Chicago v. Samedan Oil Corp.*, 192 F.2d 282 (10th Cir. 1951); *McCammon v. Texas Company*, 137 F.Supp. 256 (D.Kan.1955); *Smith v. Moody*, 192 Ark. 704, 94 S.W.2d 357 (1936); *Clovis v. Pacific Northwest Pipeline Corp., supra; Somers v. Harris Trust & Savings Bank, supra; Hodges v. Mud Branch Oil & Gas Co.*, 270 Ky. 206, 109 S.W.2d 576 (1937); *Trawick v. Castleberry*, 135 Okla. 1, 275 P.2d 292 (1953); *Clifton v. Koontz, supra*.

under both the Unit Agreement and venerable precedents to develop reasonably the subject property. Whether Exxon has done so is a fact question which must be resolved, very probably with the aid of experts. It is the kind of factual determination which is seldom carried by the summary judgment vehicle. It will be the Mizes' burden to establish that Exxon was deficient in its efforts to develop reasonably the 39 acres it declines to release from the lease. *See Clifton v. Koontz, supra.*

The summary judgment, insofar as it dismisses the claim for damages for drainage, is AFFIRMED. The grant of summary judgment dismissing the Mizes' claim for cancellation of the lease is REVERSED and that aspect of the case is REMANDED for further proceedings not inconsistent herewith.