Lessors Thomas Jones and Gladys Jones appeal from a final decree of the Circuit Court of Fayette County, declaring an oil and gas lease to be valid and in full force and effect as to all acreage described therein. Bronco Oil Company (lessee) is an assignee of the original lessee's rights under the lease in question.
The facts of this case are as follows:
On July 23, 1969, lessors entered into the oil and gas lease in question with H.E. Bollar, who subsequently assigned his rights under the lease. The lease covers 1696 1/2 acres of land in Fayette County, in which lessors had an interest equal to 1659 net mineral acres. The term of the lease was ten years, and "as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder." From 1969 through 1978, lessees paid the annual rental required under the lease for the privilege of postponing the commencement of drilling operations during the primary term.[1]
In accordance with both the pooling clause of the lease and the special field rules promulgated by the State Oil and Gas Board for the Musgrove Creek Field, lessee attempted to establish a 320-acre drilling unit by pooling with other lands 122 acres (of which lessee had an interest of 62 net mineral acres) covered by the lease. On May 10, 1979, lessee sought a permit to drill a gas well on the proposed unit, which permit was approved by the supervisor of the State Oil and Gas Board on May 14. Later in May, a producing gas well was drilled on the unit, but off the leased premises. Thereafter, the well was shut in, and in June lessee paid lessors a $100.00 shut-in royalty in order to defer production of gas for one year.[2]
Subsequent to the issuance of the drilling permit to lessee, it was discovered that certain persons claimed an interest in separately owned tracts or mineral interests comprising something less than two acres in the proposed drilling unit. Upon petition by lessee, the State Oil and Gas Board entered an order force integrating these lands and interests, establishing a gas drilling and producing unit as previously designated by lessee and approved by the Board's supervisor. Additionally, the Board confirmed the issuance of the drilling permit, and approved the lessee's location of the gas well. It also named lessee the operator of the unit.
In October 1979, lessee executed a "Declaration of Unit" that described the leases and interests combined into the unit, including the lease in question. Also, after the expiration of the primary term of the lease, *Page 613 
lessors executed two division order agreements which state the following:
 The undersigned hereby, adopt, ratify and confirm each oil and las lease, together with any amendments thereto, under which the gas to which this division order applies is produced. If the production which is the subject of this division order is obtained from a unit or units, the establishment of such unit or units is hereby ratified, confirmed and adopted.
Lessors concede that they executed these agreements voluntarily, and that they agreed to ratify and confirm the entire lease. Moreover, they admit receiving production royalty payments arising under these agreements beginning in December 1979, when the gas well on the unit was placed in production.
Lessors filed this action pursuant to § 9-17-50, Code 1975, requesting the trial court to declare that the lease had expired on July 22, 1979 (the end of the primary term), except as to the 67 net mineral acres included in the gas drilling unit. The court entered its final decree based upon the pleadings and a stipulation of facts agreed to by the parties. From that decree, lessors appeal.
Lessors argue that the lease terminated on July 22, 1979, because the drilling unit was not formed until after the well was drilled and shut in. In support of this argument, they rely on the cases of Wilcox v. Shell Oil Company, 226 La. 417,76 So.2d 416 (1954), and Mallett v. Union Oil and Gas Corporation,232 La. 157, 94 So.2d 16 (1957), decisions rendered by the Supreme Court of Louisiana.
In Delatte v. Woods, 232 La. 341, 94 So.2d 281 (1957), a case factually similar to that sub judice, plaintiffs in that case also greatly relied on the Wilcox case. In rejecting the application of Wilcox to the facts in Delatte, the Supreme Court of Louisiana stated:
 The Wilcox case . . . is readily distinguishable from the instant case. This distinction lies in the fact that the former case deals with the improper and unauthorized creation of a voluntary unit, the interpretation of a contract between the parties relating to the voluntary pooling clause contained therein, and the effect of operations on an improperly created and unauthorized voluntary unit.
 In the instant case we are called upon to deal with a unit compulsorily created by an order of the Commissioner of Conservation, and the interpretation and effect of a contract between the parties as to the obligations flowing therefrom but which has been substituted for and superseded by an order of the Commissioner of Conservation. It is apparent therefore that the Wilcox case is neither controlling nor analogous to that presented here.
232 La. at 363, 94 So.2d at 289. For similar distinctions, both factual and legal,[3] we hold that the principles announced inWilcox, and followed in Mallett v. Union Oil and GasCorporation, supra, have no bearing on the determination of this case.
In Delatte, the Supreme Court of Louisiana proceeded to address the significance of the existence of a shut-in gas well on a validly created unit, as in the instant case. The conclusion reached by the court illuminates, and provides the correct interpretation of, our oil and gas conservation statutes, which provide, in part, that a drilling or production unit, as established by the State Oil and Gas Board, "means the maximum area which may be efficiently and economically drained by one well, and such unit shall constitute a developed unit as long as a well is located thereon which is capable of producing oil or gas in paying quantities." Code 1975, § 9-17-12 (b). The *Page 614 
court concluded that the existence of the shut-in well on an involuntary unit satisfies the lessee's obligation to drill on a leased tract included in the unit. 232 La. at 359,94 So.2d at 287. The court said:
. . . Unit B [which was established by order of the Conservation Commissioner] in which a portion of the leased premises was embraced constituted a developed area as defined by the conservation statute, supra, and therefore defendant Woods was relieved from any drilling obligation called for by his lease as extended on that portion of the leased premises embraced within said Unit B.[4]
232 La. at 359, 94 So.2d at 288. See H. Williams and R. Myers,Oil and Gas Law, § 633.6 (1981) (commenting favorably on the holding in Delatte v. Woods). We agree with this analysis, and hold that lessee's payment of the shut-in royalty specified by the lease[5] effectively held the lease beyond its primary term as to those portions of the lease premises within the unit.
We now turn to a consideration of lessors' suggestion that the existence of the gas well on a portion of the unit not covered by the lease does not maintain the lease beyond the primary term as to those parts of the leased premises outside the unit.[6] Lessors rely on the case of Texas Gulf Producing Co.v. Griffith, 218 Miss. 109, 65 So.2d 447 (1953), while conceding that the position of the Supreme Court of Mississippi is at best a minority view. See Mize v. Exxon Corp.,640 F.2d 637, 640 (5th Cir. 1981) (concerning an Alabama unit). R. Meyers, Law of Pooling and Unitization, § 14.02 (1967).
In Texas Gulf Producing Co. v. Griffith, the Supreme Court of Mississippi concluded that
. . . it was not contemplated under the [Mississippi] conservation statutes authorizing the establishment of drilling units and the compulsory pooling resulting therefrom that the establishment of the unit and the production from a well on land therein other than the leased land should affect the leased land without the unit.
65 So.2d at 452. The court indicated that its holding was premised on a concern that production obtained from a well on an involuntary unit, but not on leased land, could hold a lease in effect "indefinitely" as to the leased land outside the unit, depriving lessor of property without due process of law.Id.
Having carefully considered those authorities commenting onTexas Gulf Producing Co. v. Griffith, we conclude that the position adopted therein by the Supreme Court of Mississippi was overly paternalistic and erroneous. Among other things, it has been noted that within every oil and gas lease there is an implied obligation to develop the leased lands, and that this obligation remains in full force as to those lands outside a unit. Mize v. Exxon Corp., 640 F.2d at 641; Buchanan v.Sinclair Oil Gas Company, 218 F.2d 436, 441 (5th Cir. 1955); R. Meyers, Law of Pooling and Unitization, § 14.02 (4). In addition, lessors have the option of including within a lease a clause providing for the division of leased lands in the event of partial pooling.[7] Delatte v. Woods, 232 La. at 362,94 So.2d 289. Moreover, where a unit has been force pooled to comply with *Page 615 
special field rules, as in this case, we must regard it as prima facie valid, Code 1975, § 9-17-15, presuming as a matter of law that the Board's action was in good faith, "though the effect is to hold lands subject to lease in circumstances where otherwise the lease would have expired." R. Meyers, Law ofPooling and Unitization, § 14.02, n. 18 (Cum.Supp. 1983),citing Miller v. Menefee, 228 So.2d 689 (La.Ct.App. 1969).
For the foregoing reasons, we hold that proper payment of the shut-in gas royalty preserved the validity of the lease beyond the primary term as to those leased lands outside, as well as within, the unit. See Delatte v. Woods, 232 La. at 361,94 So.2d at 288-289 (discussing indivisible nature of lessor's obligation to deliver the leased land). The judgment of the trial court is due to be, and it is hereby affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, ALMON and EMBRY, JJ., concur.
[1] Lessees, or their predecessors in title, conducted drilling operations on the leased land on two occasions, but none of the operations resulted in a producing well.
[2] The lease included a provision for $100.00 to be paid annually for a shut-in gas well to be considered as producing under the habendum clause of the lease.
[3] In passing, we note our agreement with the view of the Supreme Court of Louisiana that the orders of the regulatory authority charged with the responsibility of preventing waste of the state's oil and gas "supersede, supplement, replace, and are incorporated in the provisions and obligations of contracts and leases relating to mineral development. [And,] that these orders become the law as between the parties in determining their respective rights and obligations." Delatte v. Woods,232 La. at 357, 94 So.2d at 287.
[4] The court indicated that its holding was in accordance with the general rule that
 . . . the drilling and production of oil from a unitized area constitutes an exercise and user of the mineral rights throughout the entire unit and operates as a substitute for performance of drilling obligations contained in a mineral lease covering any property or tract located within the unit.
Delatte v. Woods, 232 La. at 358, 94 So.2d at 288.
[5] Lessors stipulated that the shut-in royalty payment, and all other payments made by lessee, were made in a timely fashion and in accordance with the terms and conditions of the subject lease.
[6] Lessors concede that the lease remains in full force and effect as to those parts of the leased acreage within the unit established by the Board.
[7] A Pugh clause. See R. Hemingway, Law of Oil and Gas, § 7.13 (D) (1983).