**STATE BANKING BOARD et al.,**
**Appellants,**

**v.**

**PROPOSED BAYPORT BANK OF PASA-**
**DENA, Texas, Appellee.**

No. 12180.

Court of Civil Appeals of Texas,
Austin.

Nov. 6, 1974.

Rehearing Denied Dec. 4, 1974.

John L. Hill, Atty. Gen., John H. Banks, Asst. Atty. Gen., Austin, Thorne Dobbins, Pasadena, for appellants.

Arthur Mitchell, Mitchell & Stewart, Kirk Patterson, San Antonio, for appellee.

PHILLIPS, Chief Justice.

Appellee, the proposed Bayport Bank of Pasadena, Harris County, Texas, and its directors, made application to appellant, State Banking Board, for a charter for a bank to be located in Pasadena. This application was made pursuant to the provisions of Article 342–305, Vernon's Annotated Civil Statutes. After the hearing,[1] the application was denied on the theory that there was no public necessity for such bank and the absence of volume of business such as to indicate a profitable operation.[2] The Board also found that the proposed officers and directors had sufficient banking experience, that the proposed capital structure was adequate and that the applicants were acting in good faith. The Texas Independent Bank of Pasadena intervened and aligned itself with the Banking Board. After a trial de novo the court reversed the order of the Board and ordered the charter issued. We reverse the judgment of the trial court and render judgment that the order of the Board denying the charter be reinstated.

We sustain appellants' predominant point that, as a matter of law, there is substantial evidence in the record made before the trial court which would require that court to uphold the order of the Board denying the charter to appellee, and that the trial court erred in not so holding.

The evidence developed by appellee before the trial court makes a strong case for the issuance of a charter. If the Board had seen fit to grant the charter, we would have had no choice but to affirm its action. In brief summary: there was testimony that the bank's capital would be at least 3½ million dollars; there was expert testimony that only 3 million dollars in capitalization would be needed to make the bank profitable; a witness testified that he brokered loans, or knew of loans, totalling $18,200,000 for 1,161 apartment units within one-half mile of the proposed bank from 1970 to September, 1973; another witness testified that he had wired 1,400 apartment units in the immediate area of the proposed bank since 1970; many real estate developments were being "planned" as of September, 1973, in the immediate area of the proposed bank site; old businesses and dwellings in the immediate area were pointed out on an aerial photograph which included a shopping center, junior college and housing developments. Appellee also pointed to multi-million dollar petroleum corporations located on the ship channel which it contended were included in the trade area according to its expert witness; however, these were excluded by intervenor's expert witness. Further testimony was given as to the inadequacy of the existing bank service and the enthusiastic reception that would be given to a stock offering for the proposed bank. Appellee also introduced into evidence over one hundred written interrogatories of persons residing in the immediate area of the proposed bank testifying to the amounts of money they would deposit in the bank the first year and as to the amounts of money

---

1. Both appellee and the American Bank of Pasadena had made applications to the Board for banks to be located at the same road intersection in Pasadena. The hearings on both applications were consolidated and an order entered denying each respective application. American Bank of Pasadena did not appeal this decision.

2. For a charter to be issued under Article 342–305, V.A.C.S., the following requirements must be fulfilled: "(1) A public necessity exists for the proposed bank; (2) The proposed capital structure is adequate; (3) The volume of business in the community where such proposed bank is to be established is such as to indicate profitable operation of the proposed bank; (4) The proposed officers and directors have sufficient banking experience ability and standing to render success of the proposed bank probable; and (5) The applicants are acting in good faith."

their friends and business associates would place in the bank in the first year.

■ Although, as appellee contends, "public necessity" and "profitability" are somewhat synonymous, Chimney Rock National Bank of Houston v. State Banking Board, 376 S.W.2d 595 (Tex.Civ.App.1964, no writ), we cannot agree with its assertion that, from the evidence presented, these statutory requirements have been established as a matter of law inasmuch as there is no substantial evidence militating against them.

There is another side to this story. Evidence presented by a banking commissioner, by the president of the intervenor bank and his expert witness, and by the testimony of appellee's own expert witness at another hearing some nine months prior to the hearing at bar, casts a shadow of doubt on the profitability or need for this new bank. We find that this element of doubt is sufficient for reasonable minds to conclude against the need or profitability of the venture. Consequently, we find that there was substantial evidence to uphold the Board's order. Gerst v. Guardian Savings and Loan Association, 434 S.W.2d 113 (Tex.1968).

From the beginning, the trial centered on a large aerial photograph of the area. Whereas there was some divergence on the boundaries of the area that the proposed bank would serve, these differences are not crucial. The photograph disclosed large areas of woodland or fields completely devoid of any type of building. This factor certainly corroborated the testimony of Banking Board member Jesse James who, from a personal inspection of the area stated, "I drove all out in this area, drove by Spencer and Red Bluff [the site of the proposed bank]. I saw a little shopping center there and a few little scattering businesses, and the residences out there, and that was my complete look at it." There are three banks presently serving the area and the president of Texas Independence Bank in Pasadena (the interve-

nor in this case which had been open for business for 35 days at the time of the hearing before the Board) testified as to the high rate of competition for the available banking business. He testified that he considered Texas Independence Bank a "perimeter bank" at the present, that is, a bank on the perimeter of the business and residential development. This witness further testified that the appellee's proposed bank "are [sic] further out of town than what we are." His conclusion was that another bank in the same trade area would seriously harm the natural expected growth of the Texas Independence Bank as that growth was projected to the State Banking Board. We also point out that Dr. James Stafford, appellee's expert witness in the case at bar, had testified in opposition to intervenor's bank application some nine months previous to the hearing at bar. In stating his opposition to the granting of intervenor's charter, Stafford testified: "Proposed bank is premature—no present public need . . . the claimed prime trade area is much larger than could conceivably be served by the proposed bank." While Stafford's testimony before us strongly supports appellee's application for a charter, and though Stafford testified that conditions had changed since his testimony against the granting of a charter in the same area, his opposition testimony is still relevant.

This brings us to the testimony of intervenor's expert witness in opposition to the granting of the charter. This witness was William Blockman. The trial court granted appellee's motion to strike Blockman's entire testimony either on the theory that the testimony was hearsay or that Blockman had not qualified as an expert. Whichever the case, we sustain appellants' point of error in this regard and hold the testimony admissible.

■ There is little doubt as to Dr. Blockman's theoretical credentials. He received his Ph.D. from the University of Wisconsin in economics in 1963. Previously he received his Master's degree and

Bachelor's degree from the same institution. During this time he was a teaching assistant at the University of Wisconsin in the field of principles of economics, labor relations and labor history. In 1959 he was an assistant professor of economics, financial management, investments, labor relations law, principles of economics, labor relations and public finance. He has also taught at Louisiana State University, University of North Carolina and the University of Houston. He has prepared and presented economic feasibility studies used in bank and savings and loan applications in Texas for some twenty or thirty institutions.

■■ In preparing for the testimony he gave in this case, Dr. Blockman used three reports that had been admitted into evidence before the Banking Board concerning the area in question. These reports included the report prepared by Dr. Stafford at the American Bank hearing and his opponent's report at the Texas Independence Bank hearing. In addition, Dr. Blockman traveled in the area, collected data prepared by the U.S. Census Department and called on a few local concerns. None of this evidence would be excluded under the hearsay rule as it applies to evidence presented before the Banking Board or the Savings and Loan Commissioner. Those portions of the evidence, detailed above, which may be technically labeled as hearsay were admissible under the general rule applicable to the testimony of an expert witness. Lewis v. Southmore Savings Association, 480 S.W.2d 180 (Tex.1972).

Dr. Blockman's case against the proposed bank may be summarized as: (1) type of building or construction characterizing the trade area surrounding the proposed bank as not being indicative of the type of population that would use the proposed bank; (2) the quality or type of population present in the area as being less than likely to use the proposed bank; and, (3) the adequacy of the banking service presently available.

Dr. Blockman described the trade area surrounding the proposed bank as being about 25 square miles. Out of this area 15 square miles are vacant or occupied by petro-chemical industries. This trade area is defined by natural boundaries such as major highways. There are presently three banks and a number of credit unions presently serving this area. There is a population of approximately 8,000 persons in the area of which a young population under 19 years comprises the largest part. Blockman stated that a younger group, generally, has less funds, higher consumption patterns, less deposits and less savings than an older, more stable population. A lower middle-class income is projected consisting mainly of blue collar workers (petro-chemical). Of these workers, 30.7% are in manufacturing, 13.5% in retail trade and 12.5% in construction. Thus the combination of blue collar salaries and younger families indicates that the trade area would have a lower per capita bank balance, higher spending than saving. In addition, 11% of the trade area earn less than $6,000, 33% earn less than $10,000 and 55% earn less than $12,000. Statistics were also presented to show that the educational level of the population in the area was considerably below that of the surrounding areas. There is a 100% increase over the Deer Park area, immediately to the north, in persons 25 years or over who have not completed any schooling and there are half again as many persons who did not complete any school as there are in Harris County itself.

Blockman then stated that certain housing characteristics are indicative of the "bankability" or the level of banking activity that one would expect from a particular area. Out of the new housing units added in the trade area in 1972, 8.2% of them were single-family, and 91.8% were multiple-family. In Deer Park 42.9% were single-family, and 57.1% multiple-family. In the Houston area in general the figures disclose 28.1% single-family as compared with 71.9% multiple-family. A multiple-

family unit generally describes an apartment unit. Generally, homeowners, as a whole, represent higher deposits and greater banking activity than apartment dwellers.

Dr. Blockman then concluded that in his opinion the proposed bank would not be profitable within a reasonable period of time. He pointed out that there are already three banks within the trade area, one of them Texas Independence Bank, was a very new institution; another, the National Bank at Indio Park was relatively new. He stated that these banks plus the very large number of credit unions in the area result in a high level of competition, and that an additional banking facility could be harmful to existing institutions.

In our judgment, reasonable minds may well have reached the same conclusion that the Banking Board reached, consequently we hold that there was substantial evidence to uphold the order. Lewis v. Heritage Savings Association, 502 S.W.2d 943 (Tex.Civ.App.1973, no writ).

■ Appellee has a counterpoint, which we overrule, asking, in the alternative, that this case should be reversed and remanded for failure of the State Banking Commissioner to base his recommendation on the written reports of the charter application investigation as required by Article 342–305, subd. C, V.A.C.S. In support of this position, appellee cites Lewis v. Gonzales County Savings and Loan Association, 474 S.W.2d 453 (Tex.1971) in which the court held the Savings and Loan Commissioner had violated his statutory mandate that his findings be accompanied by a "concise and explicit statement of the underlying facts." This case is not controlling here because

the record made before the Savings and Loan Commissioner is the basis on which an appeal from the Commissioner's order is predicated. In a banking case the trial is *de novo* before the court based on evidence introduced at trial. In the next place, the Commissioner may well have based his recommendation on the written report of the charter application investigation even though appellee would have drawn a different conclusion from the report.

■ We also overrule appellee's counterpoint, in the alternative, that the case should be reversed and remanded because a board member admitted that in casting his vote he considered not only evidence found in the application, investigation report or public hearing but that he also considered his own personal inspection of the area, though he did not make a summary of such inspection available to the parties. That this was a denial of "notice of hearing," required by the statute thus denying appellee a right to confront the evidence gathered *ex parte* by a board member. We hold that if the independent investigation of this board member was error, under the facts of this case, it was harmless error. Rule 434, Texas Rules of Civil Procedure. We point out also that this board member's testimony before the district court was that of a competent witness in a trial *de novo* at which time he was fully available to appellee for cross-examination.

The judgment of the trial court is reversed and the judgment here rendered reinstating the order of the Banking Board denying appellee's application for the proposed bank.

Reversed and rendered.